## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

ROBINHOOD DERIVATIVES, LLC

            *Plaintiff*,

v.

DANA NESSEL, in her official capacity as
Attorney General of the State of Michigan,
*et al.*,

            *Defendants*.

Civil Action No. 1:26-cv-00730

Oral Argument Requested

## BRIEF IN SUPPORT OF PLAINTIFF
## ROBINHOOD'S MOTION FOR A PRELIMINARY INJUNCTION

## ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................................1

FACTUAL BACKGROUND ..........................................................................................................4

    A.    Event Contract Regulation by the CEA and CFTC ...................................................4

    B.    Futures Commission Merchant Regulation by the CEA and CFTC.......................7

    C.    Robinhood's Event Contracts ..................................................................................8

    D.    The Michigan Lawsuit Against Kalshi ....................................................................9

ARGUMENT ...............................................................................................................................10

I.      ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS......................................10

    A.    The CEA Preempts Application of State Gaming Laws to Sports-Related
              Event Contract Trading on CFTC-Designated Exchanges. ...................................11

    B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-
              Related Event Contracts Includes Those Opened on Robinhood's
              Platform.................................................................................................................19

II.     ROBINHOOD WILL SUFFER IRREPARABLE HARM. ..............................................21

III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN
       ROBINHOOD'S FAVOR. ...............................................................................................23

IV.    NO SECURITY—OR ONLY DE MINIMIS SECURITY—IS APPROPRIATE.............23

CONCLUSION.............................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
   46 F.4th 489 (6th Cir. 2022) ............................................................................................21, 22

*Alden v. Maine*,
   527 U.S. 706 (1999)..............................................................................................................22

*Am. Agric. Movement, Inc. v. Bd. of Trade*,
   977 F.2d 1147 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v.*
   *Doyle*, 66 F.3d 867 (7th Cir. 1995)..................................................................................5, 6, 17

*Arizona v. United States*,
   567 U.S. 387 (2012)..............................................................................................................18

*Basicomputer Corp. v. Scott*,
   973 F.2d 507 (6th Cir. 1992) ...........................................................................................21, 22

*Blue Lake Rancheria v. Kalshi Inc.*,
   No. 25-cv-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025), *appeal filed*,
   No. 25-7504 (9th Cir. Nov. 25, 2025)................................................................................2, 11

*BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*,
   904 F.3d 755 (9th Cir. 2018) ...............................................................................................12

*Caspar v. Snyder*,
   77 F. Supp. 3d 616 (E.D. Mich. 2015)...................................................................................22

*Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.*,
   776 F.3d 411 (6th Cir. 2015) ...............................................................................................18

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
   162 F.4th 631 (6th Cir. 2025) ...............................................................................................23

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
   751 F.3d 427 (6th Cir. 2014) ...............................................................................................10

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)..........................................................................................................11, 19

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*,
   No. 01 Civ. 11602 (RWS), 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002)............................18

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001)..........................................................................................16, 17

ii

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
    458 U.S. 141 (1982) ........................................................................................................ 12, 19

*Helwig v. Kelsey-Hayes Co.*,
    857 F. Supp. 1168 (E.D. Mich. 1994), *aff'd*, 93 F.3d 243 (6th Cir. 1996) .............................. 23

*Hofmayer v. Dean Witter & Co.*,
    459 F. Supp. 733 (N.D. Cal. 1978) .................................................................................... 11, 16

*Hunter v. Fed. Energy Reg. Comm'n*,
    711 F.3d 155 (D.C. Cir. 2013) ............................................................................................. 11

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) ............................................................................................................ 17

*Jones v. BC Christopher & Co.*,
    466 F. Supp. 213 (D. Kan. 1979) ......................................................................................... 16

*KalshiEx LLC v. CFTC*,
    No. 24-5205, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) .................................................... 20

*KalshiEx LLC v. CFTC*,
    No. CV 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ................................................. 4

*KalshiEx LLC v. Flaherty*,
    No. 25-1922 (3d Cir. July 31, 2025) ..................................................................................... 17

*KalshiEx LLC v. Flaherty*,
    No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), *appeal filed*, No. 25-1922
    (3d Cir. May 8, 2025) ................................................................................................... *passim*

*KalshiEx LLC v. Martin*,
    No. 25-cv-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025), *appeal filed*,
    No. 25-1892 (4th Cir. Aug. 1, 2025) ..................................................................................... 2

*KalshiEx LLC v. Orgel*,
    No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ................................ *passim*

*KalshiEx, LLC v. Hendrick*,
    No. 25-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025), *abrogated on other
    grounds by Hendrick*, ECF No. 237 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-cv-
    7516 (9th Cir. Nov. 25, 2025) ...................................................................................... *passim*

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ............................................................................................................ 18

*Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    605 F. Supp. 1105 (N.D. Ga. 1985) ..................................................................................... 17

*Massachusetts v. KalshiEx LLC*,
No. 2584CV02525, Dkt. 47 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025) ........................2

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ............................................................................................................18, 20

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .................................................................................................................21

*N. Am. Derivatives Exch., Inc. v. Nevada*,
No. 25-7187 (9th Cir. Feb. 17, 2026) ........................................................................................3

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
467 F.3d 999 (6th Cir. 2006) ...................................................................................................10

*Nessel v. KalshiEX LLC*,
26-001087-CZ (Ingham Cnty. Ct. Mar. 3, 2026) ............................................................. *passim*

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981) ..........................................................................................11

*Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*,
727 F.3d 646 (7th Cir. 2013) ...................................................................................................20

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ...................................................................................................................2

*Robinhood Derivatives, LLC v. Dreitzer*,
No. 25-cv-07831 (9th Cir. filed Dec. 12, 2025) .................................................................3, 14

*Robinhood Derivatives, LLC v. Dreitzer*,
No. 2:25-cv-01541 (D. Nev. filed Aug. 29, 2025) .....................................................................3

*Robinhood Derivatives, LLC v. Flaherty*,
No. 1:25-cv-14723 (D.N.J. filed Aug. 29, 2025) .......................................................................3

*Schoolcraft Mem'l Hosp. v. Mich. Dep't of Cmty. Health*,
570 F. Supp. 2d 949 (W.D. Mich. 2008) .................................................................................23

*Slaney v. Int'l Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) ...................................................................................................12

*Slyusar v. Holder*,
740 F.3d 1068 (6th Cir. 2014) .................................................................................................10

*United States v. Wilkinson*,
986 F.3d 740 (7th Cir. 2021) ...................................................................................................13

iv

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................................................20

*Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*,
   490 F. Supp. 343 (D. Minn. 1980) .....................................................................................11, 16

*Zahuranec v. Int'l Union United Auto., Aerospace, & Agric. Implementation Workers of
Am.*,
   No. 1:05-cv-1588, 2005 WL 1389255 (N.D. Ohio June 13, 2005) ...................................23, 24

**Statutes**

7 U.S.C. § 1a(19)(iv) .........................................................................................................................13

7 U.S.C. § 1a(28) .........................................................................................................................7, 20

7 U.S.C. § 1a(47) .......................................................................................................................13, 14

7 U.S.C. § 2(a)(1)(A) ...............................................................................................................*passim*

7 U.S.C. § 2(e) ...................................................................................................................................5

7 U.S.C. § 6f .....................................................................................................................................7

7 U.S.C. § 7(a) ...................................................................................................................................5

7 U.S.C. § 7a-2(c) .............................................................................................................................2

7 U.S.C. § 7a-2(c)(1) .........................................................................................................................6

7 U.S.C. § 7a-2(c)(2) .........................................................................................................................6

7 U.S.C. § 7a-2(c)(4)(A) ....................................................................................................................6

7 U.S.C. § 7a-2(c)(5)(B) ....................................................................................................................6

7 U.S.C. § 7a-2(c)(5)(C)(i) ...............................................................................................5, 6, 16, 19

7 U.S.C. § 8(b) ...................................................................................................................................6

7 U.S.C. § 16(e)(1)(B)(i) ...................................................................................................................5

Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 ............................................*passim*

Michigan Lawful Sports Betting Act, Act 149 of 2019, MCL § 432.401 *et seq.* ...................*passim*

MCL § 432.413(1)(a) .......................................................................................................................21

MCL § 432.413(2) ......................................................................................................................21, 24

## Other Authorities

17 C.F.R. pt. 38 ..................................................................................................................5

17 C.F.R. § 1.10 ..................................................................................................................8

17 C.F.R. § 1.11 ..................................................................................................................8

17 C.F.R. § 1.12 ..................................................................................................................8

17 C.F.R. § 1.14 ..................................................................................................................8

17 C.F.R. § 1.15 ..................................................................................................................8

17 C.F.R. § 1.17 ..................................................................................................................8

17 C.F.R. § 1.55 ..................................................................................................................8

17 C.F.R. § 1.71 ..................................................................................................................8

17 C.F.R. § 3.10(c) ..............................................................................................................7

17 C.F.R. § 17.00 ................................................................................................................8

17 C.F.R. § 38.3(a) ..............................................................................................................5

17 C.F.R. § 38.151 ..............................................................................................................7

17 C.F.R. § 38.250 ..............................................................................................................7

17 C.F.R. § 40.2(a) ..............................................................................................................6

17 C.F.R. § 40.3(a) ..............................................................................................................6

17 C.F.R. § 40.11 ...........................................................................................................6, 19

120 Cong. Rec. 30,464 (1974) ......................................................................................5, 17

120 Cong. Rec. 34,736 (1974) ..........................................................................................17

120 Cong. Rec. 34,997 (1974) ..........................................................................................17

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ..................................................16, 17

*AG Nessel Files Lawsuit Against Kalshi for Allegedly Violating the Michigan Lawful*
*Sports Betting Act*, Mich. Dep't of Att'y Gen. (Mar. 5, 2026),
https://www.michigan.gov/ag/news/press-releases/2026/03/05/ag-nessel-files-lawsuit-
against-kalshi ................................................................................................................10, 22

CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*,
  73 Fed. Reg. 25,669, (May 7, 2008) ......................................................................................14

H.R. Rep. No. 93-975 (1974)................................................................................................17, 18

H.R. Rep. No. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5894 ........................................16

Hearings Before Comm. on Agriculture and Forestry, United States Senate, on S. 2485,
  etc., 93d Cong., 2d Sess. 685 (1974) ...................................................................................4, 5

Michigan Gaming Control Board, *Michigan Gaming Control Board Opens Investigations
  Into Unlicensed Sports Prediction Markets* (Apr. 11, 2025),
  https://www.michigan.gov/mgcb/news/2025/04/11/michigan-gaming-control-board-
  opens-investigations-into-unlicensed-sports-prediction-markets ............................................22

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev.
  657, 687-88 (1982)................................................................................................................17

S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843............................................16

U.S. Const. art. VI, cl. 2...........................................................................................................11

## PRELIMINARY STATEMENT[1]

Robinhood Derivatives, LLC ("Robinhood") is a Commodity Futures Trading Commission ("CFTC")-registered futures commission merchant ("FCM") that offers approved users access to trade sports-related event contracts through the Robinhood platform.  While Robinhood, as a registered FCM, facilitates the placement and liquidation of event contracts for its users, the sports-related contracts trade on an exchange operated by KalshiEx, LLC ("Kalshi"), which is registered with the CFTC as a designated contract market ("DCM").[2]

On March 3, 2026, the Michigan Attorney General's Office ("Michigan" or the "State") filed a civil enforcement action against Kalshi on the theory that federally regulated event-contract trading "violate[s] Michigan's prohibitions against gambling as well as several provisions of [the Lawful Sports Betting Act ("LSBA")]."  *See* Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ ¶ 3 (Ingham Cnty. Ct. Mar. 3, 2026).  Michigan asserts a claim under the LSBA and a common law public nuisance claim, and seeks to permanently enjoin Kalshi from "engaging in or advertising" its business.  *Id.* ¶¶ 90-102, Conclusion & Relief Sought.[3]  This action demonstrates Michigan's willingness to use state law to attempt to shut down federally authorized markets.  And Michigan has indicated that it will not stop there, alleging that "[e]ntities *like* Kalshi continue to

---

[1] The parties have met and conferred, and Defendants have represented that they will not enforce state gaming laws against Robinhood during the pendency of this Motion, provided that Defendants may enforce with 48-hours' notice, during which time Robinhood may also move for a temporary restraining order.  During the pendency of any motion for a temporary restraining order, Defendants also will not enforce state gaming laws against Robinhood.  In reliance on those representations, Robinhood is not seeking a temporary restraining order at this time.

[2] Robinhood is actively working to offer sports-related event contracts on contract markets beyond Kalshi's.  Hickerson Decl. ¶ 8.  As soon as June of this year, Robinhood intends to begin offering event contract trading via a DCM—Rothera Exchange and Clearing LLC ("Rothera")— controlled by a joint venture between Robinhood Markets, Inc. and another entity.  *Id.* ¶¶ 9-10.

[3] Kalshi has since removed the case to federal court.  *See* Notice of Removal, *Nessel v. KalshiEx LLC*, No. 1:26-cv-00731 (W.D. Mich.), ECF No. 1.

circumvent the gaming prohibitions imposed by" Michigan gambling laws. *Id.* ¶ 5 (emphasis added).

As multiple federal courts have already held, however, state gaming law as applied to trading on CFTC-designated contract markets is preempted by the Commodity Exchange Act's ("CEA") comprehensive federal framework for regulating commodity futures, options, and swaps trading. *KalshiEx LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7-10 (M.D. Tenn. Feb. 19, 2026); *KalshiEx LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at *3-8 (D.N.J. Apr. 28, 2025) ("*Kalshi D.N.J.*"), *appeal filed*, No. 25-1922 (3d Cir. May 8, 2025); *see also KalshiEx, LLC v. Hendrick*, No. 25-00575, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025), *abrogated on other grounds by Hendrick*, ECF No. 237 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-cv-7516 (9th Cir. Nov. 25, 2025); *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162-JSC, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025), *appeal filed*, No. 25-7504 (9th Cir. Nov. 25, 2025).[4]

---

[4] Two courts have reached the opposite conclusion. *KalshiEx LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *1 (D. Md. Aug. 1, 2025), *appeal filed*, No. 25-1892 (4th Cir. Aug. 1, 2025); *Massachusetts v. KalshiEx LLC*, No. 2584CV02525, Dkt. 47 at 1 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025) (hereinafter "*Kalshi Mass.*"). Those decisions are inconsistent with the weight of authority, and their reasoning is flawed. Foremost, the decisions do not address whether the CEA expressly preempts state law. *Martin*, 2025 WL 2194908, at *5-13 (analyzing only implied field and conflict preemption); *KalshiEx Mass.*, Dkt. 47 at 7-14 (same). As a result, the courts wrongly apply a presumption against preemption, *Martin*, 2025 WL 2194908, at *5-6; *Kalshi Mass.*, Dkt. 47 at 8, which has no place where "the statute contains an express pre-emption clause," *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). The courts also assume (incorrectly) that sports-related event contract trading is gambling, and that assumption colors both opinions. *See, e.g.*, *Martin*, 2025 WL 2194908, at *6; *Kalshi Mass.*, Dkt. 47 at 3. The courts also do not consider the conflict between application of state gambling laws and the Special Rule in 7 U.S.C. § 7a-2(c), namely Congress's determination in enacting the Special Rule that the CFTC would be the decisionmaker concerning which event contracts trade on DCMs, not states or state gaming commissions. *See Martin*, 2025 WL 2194908 at *11-13; *Kalshi Mass.*, Dkt. 47 at 11. The *Martin* and *Kalshi Mass.* decisions are unpersuasive.

And, just last month, the CFTC reaffirmed its longstanding view that sports-related event contracts like the ones at issue here are swaps and options over which it has exclusive jurisdiction.[5]

Kalshi has won preliminary relief on this basis against New Jersey state regulators seeking to enforce their gambling or gaming laws against its facilitation of transactions involving sports-related event contracts. *See Kalshi D.N.J.*, 2025 WL 1218313 at *3-8. In Nevada, a district court similarly granted Kalshi preliminary relief on the grounds that the CEA preempts state law, a holding on preemption which was not disturbed by the subsequent dissolution of the injunction.[6] *See Hendrick*, ECF No. 237, at 5; *see also* 7 U.S.C. § 2(a)(1)(A). And recently, the Middle District of Tennessee preliminarily enjoined state officials from enforcing state gaming law against Kalshi because "sports event contracts are 'swaps,'" and therefore, "preemption applies." *Orgel*, 2026 WL 474869, at *7. Robinhood also has ongoing litigation concerning the same issues and seeking similar relief.[7]

---

[5] *See* Amicus Brief of Commodity Futures Trading Comm'n at 1-2, ECF No. 38-2 (hereinafter "CFTC Amicus Br."), *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026).

[6] The Nevada district court later dissolved the preliminary injunction, concluding that event contracts are not swaps, but it did not disturb its earlier (correct) finding that the CEA preempts the application of Nevada gaming laws to swaps traded on DCMs. This Motion cites the decision granting the preliminary injunction for propositions that were left undisturbed by the subsequent dissolution of the injunction. For the reasons set forth below, pp. 13-15, event contracts are indeed swaps and thus fall under the exclusive jurisdiction of the CFTC, despite the Nevada district court's contrary conclusion, which is on appeal.

[7] In *Robinhood Derivatives, LLC v. Flaherty*, No. 1:25-cv-14723 (D.N.J. filed Aug. 29, 2025), the State agreed to a consent order maintaining the status quo pending the Third Circuit decision in *Kalshi D.N.J.* (argued on appeal Sept. 10, 2025), and in *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541 (D. Nev. filed Aug. 29, 2025), Robinhood has appealed the district court's denial of its motion for a preliminary injunction. *See Robinhood Derivatives, LLC v. Dreitzer*, No. 25-cv-07831 (9th Cir. filed Dec. 12, 2025). In *Robinhood Derivatives, LLC v. Campbell*, No. 1:25-cv-12578 (D. Mass. filed Sept. 15, 2025), Robinhood's motion for a preliminary injunction and the defendants' motion to dismiss are pending.

In light of Michigan's action against Kalshi, there is a real and imminent threat that Michigan will take enforcement action against Robinhood.  Were it to do so, Robinhood would face an immediate threat of civil penalties and potentially criminal penalties, along with the attendant reputational harms.  Robinhood's Michigan customers would also face abruptly losing access to sports-related event contract trading through their Robinhood accounts.  Robinhood respectfully requests a preliminary injunction.

## FACTUAL BACKGROUND

### A.    Event Contract Regulation by the CEA and CFTC

An event contract is a derivative that allows customers to trade on their predictions about the occurrence of future events.  *See KalshiEx LLC v. CFTC*, No. CV 23-3257, 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024).  Event contracts are typically structured as binary options posing a particular yes-or-no question.  A buyer takes the "yes" side and a seller takes the "no" side, and upon the expiration of the contract—typically, when the outcome of the future event in question becomes known—the value of the contract goes to the party who was right.  Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur.  *Id.* at *2.  Traders may use event contracts to mitigate risk or simply to seek a financial return.  *Id.*

The CEA sets forth a comprehensive federal framework for regulating commodity futures, options, and swaps trading.  *See Orgel*, 2026 WL 474869, at *3-4; *Kalshi D.N.J.*, 2025 WL 1218313, at *1-2.  In 1974, Congress established the CFTC, the federal agency that oversees and regulates commodity futures, options, and swaps trading.  *Kalshi D.N.J.*, 2025 WL 1218313, at *1-2.  Congress centralized regulatory authority with the CFTC to avoid the "total chaos" that could ensue if states attempted to subject the futures markets to different regulations.  Hearings Before Comm. on Agriculture and Forestry, United States Senate, on S. 2485, etc., 93d Cong., 2d

Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark); *see also Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992) (setting forth legislative history of the CFTC Act of 1974), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995). Indeed, Congress considered adding but ultimately removed from the bill's final language a provision of the CEA that would have preserved parallel state authority over futures trading. *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). As described below, the CEA was further amended by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, which brought swaps within the coverage of the CEA and added a special rule about event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

The CEA provides that the CFTC has "exclusive jurisdiction" over transactions involving event contracts—which, as described below, are swaps or contracts of sale of a commodity for future delivery—traded on registered exchanges ("designated contract markets"): "The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' …), and *transactions involving swaps or contracts of sale of a commodity for future delivery* (including significant price discovery contracts), *traded or executed on a contract market designated pursuant to section 7 of this title . . . .*" 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA expressly preserves state authority to regulate transactions "not conducted on or subject to the rules" of a CFTC-regulated exchange. *Id.* § 16(e)(1)(B)(i).

To receive the CFTC's designation as a contract market, an exchange must apply and set forth its ability to comply with CFTC rules and regulations. *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The CFTC's comprehensive regulatory framework for contract markets, including a set of 23 "Core Principles," 17 C.F.R. pt. 38, is designed to ensure and protect the integrity of those markets.

Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150-51. The CFTC may suspend or revoke an exchange's designation if it fails to comply with any rules or regulations. 7 U.S.C. § 8(b). Kalshi and Rothera are CFTC-designated contract markets.

An exchange may submit new contracts to the CFTC for approval prior to listing, or it may self-certify the contracts as complying with CFTC requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). Generally, the CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). The CEA contains a special rule relating to CFTC review and approval of event contracts, which was added by the Dodd-Frank Act of 2010. Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36. Pursuant to the special rule, the CFTC may prohibit event contracts in specific categories if it determines them to be "contrary to the public interest." 7 U.S.C. § 7a- 2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2). If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days. *See* 7 U.S.C. § 7a-2(c)(2); *see also* 17 C.F.R. § 40.11(c) (permitting the CFTC to take an additional 90 days to review event contracts). If the CFTC does not act, the new contract is deemed approved and becomes effective. *See* 7 U.S.C. § 7a-2(c)(2). For example, Kalshi self-certified and began listing sports-related event contracts on January 24, 2025. *Orgel*, 2026 WL 474869, at *5; *Kalshi D.N.J.*, 2025 WL 1218313, at *2. Because the CFTC declined to review or prohibit these event contracts, they were deemed approved and became

effective upon the expiration of the 10-day probationary period under 7 U.S.C. § 7a-2(c)(2) and are legal under federal law.

Fundamental differences in how contract markets and sportsbooks operate mean they are susceptible to different forms of risk to participants.  Contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants.  Customers can manage risk by adjusting or exiting their positions up until the contract expires, and prices respond accordingly.  These markets may be at risk of market manipulation, distortions, and inefficiencies.  Sportsbooks, by comparison, have a line set by the house, which is typically set ahead of time and, once a bet is placed, does not change for that bet.  Gamblers bet against the house, and gamblers typically do not have the option to exit their position.  Sportsbooks risk exploitation of gamblers due to the power imbalance between the house and the gambler.  Based on these different risks, it makes sense that contract markets and sportsbooks are subject to two different modes of regulation.  The federal regulations that govern commodity futures, options, and swaps trading have as a major focus creating and maintaining fair and efficient markets for trading, *see* 17 C.F.R. §§ 38.250, 38.151, whereas sportsbooks are regulated by state law and subject to the police powers of the state to halt and remedy any exploitation of gamblers.

### B.    Futures Commission Merchant Regulation by the CEA and CFTC

Robinhood is registered with the CFTC as an FCM.  Hickerson Decl. ¶ 4.  As relevant here, an FCM is "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."  7 U.S.C. § 1a(28) (subsection

7

headings omitted).  FCMs must register with the CFTC unless they fall within certain exemptions. *Id.* § 6f; 17 C.F.R. § 3.10(c).

Similar to registered DCMs, registered FCMs such as Robinhood must comply with a host of federal requirements.  FCMs are subject to reporting requirements to the CFTC, 17 C.F.R. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, and minimum financial requirements, *id.* §§ 1.12, 1.17.  FCMs must "establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the" FCM, *id.* § 1.11(c)(1), and CFTC regulations set forth elements that such a risk management program must include, *id.* § 1.11(e), as well as reporting requirements related to risk management, *see id.* § 1.15.  FCMs must "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards.  *Id.* § 155.3.  FCMs must also "adopt and implement written policies and procedures" to ensure that they or their employees comply with CFTC regulations concerning conflicts of interest.  *Id.* § 1.71.  The CFTC imposes recordkeeping requirements on FCMs.  *Id.* §§ 1.14, 1.18.  Failure to comply with these requirements could require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant."  *Id.* § 1.17(a)(4).

## C.    Robinhood's Event Contracts

On March 17, 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders.  Hickerson Decl. ¶ 5.  Robinhood intermediates its customers' sports-related event contract trades on Kalshi's exchange.  *Id.* ¶ 6.  Robinhood has entered into agreements with Kalshi that allow it to access Kalshi's contract market facilities for this purpose.  *Id.* ¶ 7.  Those agreements obligate Robinhood to ensure such access is secure and in compliance with all applicable laws, including the CEA and CFTC regulations; they also require Robinhood to comply with Kalshi's rules.  *Id.*

Robinhood is actively working to be able to offer sports-related event contracts on one or more additional DCMs. *Id.* ¶ 8. In November 2025, Robinhood's parent company, Robinhood Markets, Inc., formed a joint venture to operate a futures and derivatives exchange and clearinghouse. *Id.* ¶ 9. On January 20, 2026, the joint venture—in which Robinhood Markets, Inc. owns 50%—closed on a transaction to acquire 90% of the equity in Rothera, a DCM. Robinhood plans to offer sports-related event contracts through Rothera's DCM by June 2026, and anticipates that once its partnership with Rothera is launched, a significant portion of its event contract volume will be redirected to Rothera. *Id.* ¶¶ 9-10.

Thus, while Robinhood customers may place event contract orders in their Robinhood accounts, the trades occur on CFTC-regulated exchanges, Kalshi and (soon) Rothera. *Id.* ¶¶ 6, 9-10. When a customer opens a position through Robinhood, rather than through a DCM such as Kalshi, that merely adds CFTC regulation of Robinhood as an FCM.

### D.    The Michigan Lawsuit Against Kalshi

On March 3, 2026, Michigan filed a civil enforcement action against Kalshi on the theory that federally regulated event-contract trading violates Michigan's gaming laws. *See* Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ ¶ 3 (Ingham Cnty. Ct. Mar. 3, 2026). Michigan asserts a claim under the LSBA and a common law public nuisance claim, and seeks to permanently enjoin Kalshi from "engaging in or advertising" its business. *Id.* ¶¶ 90-102, Conclusion & Relief Sought. In its Complaint, Michigan alleges that "Kalshi operates a so-called prediction market through which residents of the State of Michigan can engage in unlicensed gambling under the guise of trading event contracts." *Id.* ¶ 2. Michigan further alleges that Kalshi's sports-related event contracts "constitute 'sports betting' because Kalshi is engaged in offering wagering on athletic events including, but not limited to 'single-game bets, teaser bets, parlays, over-under, moneyline,

pools, exchange betting, in-game betting, proposition bets, and straight bets.'" *Id.* ¶ 70 (quoting MCL § 432.403(bb)).

Critically, Michigan has indicated that it will not stop with Kalshi, alleging that "[e]ntities *like* Kalshi continue to circumvent the gaming prohibitions imposed by" Michigan gambling laws. *Id.* ¶ 5 (emphasis added). In a March 5 press release announcing the Michigan Attorney General's Office lawsuit against Kalshi, Defendant Nessel underscored that her office would "hold *those who sidestep* Michigan's consumer protections accountable," confirming that Defendants seek to enforce its state gaming laws to other offerees beyond Kalshi.[8]

## ARGUMENT

This Court considers the same factors "in determining whether to issue a TRO or preliminary injunction." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). Those factors are: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citation omitted). "The third and fourth factors merge when the Government is the opposing party." *Slyusar v. Holder*, 740 F.3d 1068, 1074 (6th Cir. 2014).

## I.    ROBINHOOD IS LIKELY TO SUCCEED ON THE MERITS.

Multiple federal courts have already recognized that the CFTC's exclusive jurisdiction over

---

[8] *AG Nessel Files Lawsuit Against Kalshi for Allegedly Violating the Michigan Lawful Sports Betting Act* ("*March 5 Press Release*"), Mich. Dep't of Att'y Gen. (Mar. 5, 2026), https://www.michigan.gov/ag/news/press-releases/2026/03/05/ag-nessel-files-lawsuit-against-kalshi (emphasis added).

trades made on DCMs preempts state gaming laws as applied to CFTC-regulated products.  *See Orgel*, 2026 WL 474869, at \*7-10 (finding that "sports event contracts are 'swaps,'" and therefore, "preemption applies."); *Kalshi D.N.J.*, 2025 WL 1218313, at \*3-8 ("Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies"); *Hendrick*, 2025 WL 1073495, at \*3-8 (finding that the CEA's "exclusive jurisdiction" language preempts the application of state law as to swaps traded on DCMs); *see also Blue Lake Rancheria*, 2025 WL 3141202, at \*7 (holding that plaintiffs "have not shown the Court has jurisdiction to decide whether" event contracts violate the CEA because the CFTC has "exclusive jurisdiction" over its contract markets).[9]  The same event contract products are at issue here as were at issue in *Orgel*, *Kalshi D.N.J.*, *Hendrick* and *Blue Lake Rancheria*, making those courts' determinations of the CFTC's exclusive jurisdiction equally applicable here.  Indeed, in one of the related litigations, the CFTC has submitted an amicus brief reaffirming that it exercises exclusive jurisdiction over transactions involving sports-related event contracts traded on DCMs.  *See* CFTC Amicus Br. at 1-2.  It is clear that Michigan law seeking to regulate those transactions is preempted.

### A.    The CEA Preempts Application of State Gaming Laws to Sports-Related Event Contract Trading on CFTC-Designated Exchanges.

The Constitution and laws of the United States "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and accordingly, "Congress has the power to preempt state law."  *Crosby*

---

[9] Numerous other courts have found that the CEA's grant of exclusive jurisdiction to the CFTC is broad and preempts other regulatory schemes, including both state and other federal statutes.  *See, e.g., Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 206-07 (N.D. Ala. 1981) (finding that the CEA preempted the application of Alabama gaming law); *Hunter v. Fed. Energy Reg. Comm'n*, 711 F.3d 155, 158-59 (D.C. Cir. 2013) (Federal Energy Regulatory Commission lacked jurisdiction in light of CFTC's exclusive jurisdiction); *Witzel v. Chartered Sys. Corp. of N.Y., Ltd.*, 490 F. Supp. 343, 347-48 (D. Minn. 1980) (preemption by CEA and CFTC regulations of Minnesota Securities Act); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) (claims arising under federal and state securities statutes barred in light of CFTC's exclusive jurisdiction).

*v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Federal law can preempt state law expressly, through a statement to that effect in the statute itself, or impliedly, through either field preemption or conflict preemption.  Field preemption exists where Congress manifests an intent to occupy exclusively an entire field of regulation.  *See Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982).  Conflict preemption exists where compliance with federal and state law is "a physical impossibility" or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (internal quotation omitted).  Here, as multiple district courts have already found, the statutory language of the CEA, its legislative history and the comprehensive regulatory framework it sets out demonstrate that Congress deliberately preempted state law.  Whether analyzed as express or implied preemption, the scope of preemption is the field of commodity futures, options, and swaps trading, including event contract trading, on CFTC-designated exchanges.

*First*, express preemption exists here: the CEA provides expressly that the CFTC "shall have exclusive jurisdiction" over options, commodity futures and swaps trading on CFTC-designated exchanges.  7 U.S.C. § 2(a)(1)(A).  Express provisions of this type are regularly held to preempt state law.[10]  *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general" preemption provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th

---

[10] This express provision does more than define the scope of the CFTC's authority vis-à-vis other federal agencies; it also defines the scope of its authority vis-à-vis the states.  The exclusive jurisdiction section goes on to provide that "*[e]xcept as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States or of any State . . . ."  7 U.S.C. § 2(a)(1)(A) (emphasis added).

Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims).

Here, the express preemption covers the field of trading on CFTC-designated exchanges.

This express preemption provision includes event contracts, which are "transactions involving swaps or contracts of sale of a commodity for future delivery" and "option[s]" over which the CFTC has "exclusive jurisdiction" when "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). The term "swap" includes "any agreement, contract, or transaction" that (among other things) "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The term "swap" was added to the CEA in 2010 by the Dodd-Frank Act. *See* Pub. L. No. 111-203, §§ 721(a)(21) (adding the definition of "swap" in 7 U.S.C. § 1a(47)), 722(a)(1)(D) (adding "swaps" to the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)(A)), 124 Stat. 1376, 1666, 1672.

Event contracts may also be considered transactions in a type of intangible commodity that the CEA calls an "excluded commodity." *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021). An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency (other than [certain exceptions]) that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

Sports-related event contracts are within these statutory definitions of swaps and transactions in excluded commodities because: (i) they are binary contracts that pay out depending on the occurrence or non-occurrence of a future event that is beyond the control of the parties to the contract; and (ii) the underlying sporting events they concern have actual or potential financial,

13

economic, and commercial consequences.[11]   *See Orgel*, 2026 WL 474869, at *7-10; *KalshiEx*

*D.N.J.*, 2025 WL 1218313, at *2, *6.  With respect to the latter requirement, the "swap" definition

does not even require *actual* consequences, it requires only *potential* consequences.  *See* 7 U.S.C.

§ 1a(47)(A)(ii).  Congress chose to use this qualifier to encompass a broad swath of derivatives.

*See Orgel*, 2026 WL 474869, at *8 ("Congress chose to use 'potential,' which is broad.").

    In any event, wins and losses in sporting events have obvious, significant financial

consequences for the players, the teams, the owners or the schools they represent, their

communities, television networks, and other stakeholders.  *See Kalshi D.N.J.*, 2025 WL 1218313,

at *6 ("Defendants argue that sporting events are without potential financial, economic, or

---

    [11] Only two district courts have concluded that sports-related event contracts are not swaps—*Hendrick*, ECF No. 237 and *KalshiEx LLC v. Schuler*, No. 2:25-cv-01165, ECF No. 69 (S.D. Ohio Mar. 9, 2026)—and neither opinion is persuasive.  In *Hendrick*, to conclude that event contracts are not swaps, the Nevada district court made two fundamental errors.  First, it created a novel and unnecessary distinction between an "event," a word used in 7 U.S.C. § 1a(47)(A)(ii), and an "outcome," a word not used in the statute, suggesting that outcomes are not events.  *Hendrick*, ECF No. 237, at 5-6.  This runs contrary to dictionary definitions and common understandings of the word "event," which includes outcomes, and creates endless interpretative challenges (*e.g.*, whether there is Game 7 of the World Series—an event under the Nevada district court's strained reading—is also an "outcome" of the previous games).  *See* Brief for Appellant at 35-39, *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-CV-07831 (9th Cir. Jan. 9, 2026); *Orgel*, 2026 WL 474869, at *7 ("President Trump winning the 2024 presidential election was an outcome, but also an event." (internal quotations omitted)).  Indeed, CFTC statements confirm that event contracts include contracts that "pay out when an outcome either occurs or does not occur," CFTC, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008).  The *Hendrick* court is the only court to accept this purported event-outcome distinction.  Second, the Nevada district court also imposed a requirement—found nowhere in the statutory definition of swap—that the swaps have "inherent" financial consequence.  *Hendrick*, ECF No. 237, at 14.

    The court in *Schuler* similarly engaged in a flawed analysis in defining swaps.  Although the *Schuler* court acknowledged that Kalshi's interpretation of the CEA was "textually permissible," it concluded that sports-related event contracts were not swaps by reasoning that the purported "goals" of the CEA "are better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly *affect commodity prices*." *Schuler*, No. 2:25-cv-01165, ECF No. 69, at 11-12 (emphasis in original).  This interpretation is atextual and simply not the law.  To the extent Michigan advances these arguments, Robinhood will respond in greater detail.

commercial consequence.  On the record before me, I disagree.").  For example, wins can increase franchise value, leading to more ticket sales, more revenue from sponsorships, merchandise, parking, and food at games, and more television viewership, as the Florida Panthers experienced after winning the 2024 Stanley Cup.  Declaration of Kevin J. Orsini in Support of Plaintiff Robinhood's Motion for a Preliminary Injunction ("Orsini Decl."), ¶ 3.  Sporting events generate economic boons for the cities in which they occur; the New York Knicks' 2025 postseason generated an estimated $195 million in economic activity from home playoff games.  *Id.* ¶ 4. Sporting events also impact the advertising revenue to TV networks; when the 2025 NBA Finals went the full seven games, ABC's sports viewership increased 17% the month the games took place.  *Id.* ¶ 5.  The outcomes of sporting events are "associated with" actual financial consequences, and they are easily "associated with" "potential" financial consequences.

Event contracts are also "options."  As the CFTC has explained, citing its own glossary, "[a]n event contract is also a binary option."  CFTC Amicus Br. at 16.  A binary option can be structured to pay $100 if a hurricane hits Florida by a certain date or $0 if one does not.  That is no different from a sports-related event contract that pays $100 if the Lions win a game but $0 if they lose.  *See Orgel*, 2026 WL 474869, at *8 (analogizing sports-related event contracts to one-touch barrier options).

The CEA expressly grants the CFTC "exclusive jurisdiction" over all "option[s]" and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  The CEA also includes a separate provision entitled "Special rule for review and approval of event contracts and swaps contracts," added by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, § 745(b), 124 Stat. at 1735-36, which confirms that the CFTC has authority over "the listing of

15

agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than [certain exemptions]), by a designated contract market or swap execution facility." *Id.* § 7a-2(c)(5)(C)(i).

*Second*, to the extent the text of the statute leaves any doubt about preemption, the legislative history of the 1974 amendment to the CEA that established the CFTC confirms that this grant of exclusive jurisdiction to regulate futures trading on DCMs was intended to establish broad field preemption. As the Conference Committee explained:

> Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States.

H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Hofmayer*, 459 F. Supp. at 737 (finding field preemption from the CEA and dismissing claims brought under preempted federal and state statutes). As the D.C. Circuit recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original). "The passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'" *Witzel*, 490 F. Supp. at 347 (quoting *Jones v. BC Christopher & Co.*, 466 F. Supp. 213, 219 (D. Kan. 1979)). Congressional statements concerning the "special rule," including by the drafters of the Dodd-Frank Act of 2010, reveal Congress's intent to vest exclusive jurisdiction over event contracts with the CFTC. *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010)

16

(statements of Sens. Lincoln and Feinstein); *see also* Brief of Amici Curiae Seven Former Members of Congress in Support of Plaintiff Appellee, *KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66 (3d Cir. July 31, 2025).

Congressional statements about the creation of the CFTC confirm the intent for broad express or implied field preemption.  The 1974 amendments to the CEA were motivated by "concerns that states might regulate futures markets" themselves and create "conflicting regulatory requirements." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156; *see also Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985) (emphasizing "the need for sole regulatory power of commodities to be placed in one federal agency").  Establishing the CFTC and endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation." *Ken Roberts Co.*, 276 F.3d at 588 (quoting 120 Cong. Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)); *see also* 120 Cong. Rec. 34,997 (1974) (remarks of Sen. Curtis on behalf of Sen. Talmadge); Senate Hearings at 685 (statement of Sen. Clark) ("[D]ifferent State laws would just lead to total chaos.").  Accordingly, the CFTC was empowered to set forth uniform rules and regulations for "all exchanges and all persons in the industry."  H.R. Rep. No. 93-975, at 79 (1974).[12]

*Third*, the CEA regulatory scheme, over which the CFTC has exclusive jurisdiction, is comprehensive as it relates to designated and registered entities, and the existence of this

---

[12] As further indication of Congressional intent that the CEA preempt broadly, during the amendment process for the 1974 amendments, the Senate considered adding but ultimately did not include a provision that retained the states' jurisdiction over futures trading. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). Congress therefore could not have intended States to regulate futures trading in parallel with the CFTC. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

comprehensive scheme further evinces Congressional intent to preempt the field and foreclose parallel state regulation. *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (comprehensive statutory framework led to the conclusion that "the Federal Government has occupied the field" in the relevant area); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986). The Supreme Court has confirmed that the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).

In addition to express or implied field preemption, conflict preemption exists here with respect to the determination of which event contracts are permitted on CFTC-designated exchanges. "Conflict preemption occurs when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.*, 776 F.3d 411, 424 (6th Cir. 2015) (internal quotations omitted). By granting the CFTC "exclusive jurisdiction" over transactions on DCMs, Congress's explicit purpose was to exclude all other attempts to regulate transactions on those exchanges. *See DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 Civ. 11602 (RWS), 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) ("When application of state law would directly affect trading on or the operation of a futures market, it . . . is preempted."). Allowing the application of state gaming laws would thus frustrate Congress's purpose in avoiding patchwork regulation. *See Orgel*, 2026 WL 474869, at *10 (holding that state law "stands as an obstacle to the accomplishment of the CEA's primary objective: uniform regulation of the derivatives market"); CFTC Amicus Br. at 27. "It is hard to see how a federally regulated nationwide derivatives exchange could function" under such disparate state regulation. *Orgel*, 2026 WL 474869, at *10.

As noted above, the special rule relating to CFTC review of event contracts vests the CFTC with the power to approve or prohibit certain event contracts.  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).  If Michigan were permitted *also* to make a determination about whether event contracts on a CFTC-regulated exchange were permitted, there would be a direct conflict between federal and state regulation because the CFTC has already impliedly approved these same event contracts.  *See Crosby*, 530 U.S. at 380 (conflict preemption exists where state law "undermines the congressional calibration of force" and is "at odds with achievement of the federal decision about the right degree of pressure to employ"); *De la Cuesta*, 458 U.S. at 153.  Here, the CFTC has allowed Kalshi's sports-related event contracts by taking no action in response to the self-certification of those contracts, making them legal under federal law, but Michigan is attempting to preclude trading of those same event contracts by enforcing Michigan sports-wagering laws against offerors of sports-related event contracts.  The conflict is clear.

**B.    The CEA's Preemption of State Gaming Laws as Applied to Sports-Related Event Contracts Includes Those Opened on Robinhood's Platform.**

Given the broad, express preemptive language and clear Congressional intent, the various district courts' holdings that the CEA likely preempts state gambling and gaming laws were well founded.  *Orgel*, 2026 WL 474869, at *9-10; *Kalshi D.N.J.*, 2025 WL 1218313, at *4; *Hendrick*, 2025 WL 1073495, at *3-7.  The same result is required where, as here, Robinhood is the CFTC-regulated entity rather than Kalshi.

*First*, Robinhood facilitates transactions which are "option[s]" or which involve "swaps or contracts of sale of a commodity for future delivery" traded on a DCM, and these transactions therefore fall squarely within the statutory grant of exclusive jurisdiction to the CFTC.  *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC "exclusive jurisdiction" over all "option[s]" and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or

executed on a contract market designated" by the CFTC).  Because it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, *see id.*, the CFTC must have jurisdiction over the entire transaction and all participants.  This includes entities like Robinhood that accept orders or otherwise facilitate transactions, as well as designated contract markets (*e.g.*, Kalshi) that execute transactions.  *See id.* § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

If states could regulate some but not all entities relevant to these transactions, such regulation would infringe on the CFTC's exclusive jurisdiction and fracture what Congress intended to be a uniform set of regulations for commodity futures and swaps trading.  Indeed, as the CFTC explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [designated contract market]*."  CFTC Brief, *KalshiEx LLC v. CFTC*, No. 24-5205, at 27, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

*Second*, the conclusion that preemption applies equally to Robinhood's facilitation of these transactions as an FCM is further supported by the fact that Congress explicitly included FCMs within the extensive set of federal regulatory requirements and CFTC oversight established to manage commodity derivatives trading.  The "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Curran*, 456 U.S. at 356 (internal quotation marks omitted), established by Congress includes FCMs that facilitate purchases and sales of commodities for future delivery and swaps.  7 U.S.C. §§ 1a(28)(A)(i)(I)(aa)(AA), (CC).

In short, the "oversight of futures commission merchants" is an "important aspect" of the CFTC's oversight responsibility for futures trading.  *Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 650 (7th Cir. 2013).  FCMs like Robinhood are an integral part of the

CEA's comprehensive regulatory scheme, and their activities in facilitating trading on DCMs are equally subject to federal preemption as those of DCMs.

## II.     ROBINHOOD WILL SUFFER IRREPARABLE HARM.

A plaintiff must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." *Orgel*, 2026 WL 474869, at *10 (quoting *Hendrick*, 2025 WL 1073495 , at *7); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  Loss of business and goodwill can also inflict irreparable injury. *See ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).

In light of Michigan's action against Kalshi, which includes allegations that "[e]ntities *like* Kalshi" are in violation of Michigan law, Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ ¶ 5 (emphasis added), Robinhood faces the imminent threat of an enforcement action by Michigan and/or the Michigan Gaming Control Board seeking civil penalties as well as, potentially, criminal penalties.  Hickerson Decl. ¶ 12.  Michigan alleges Kalshi violated at least six Michigan statutes (MCL §§ 432.413(1)(a), 432.218(1)(a), 750.301, 750.304, 750.305, 750.307).  Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ ¶ 101.  The sanctions for violation of just one of the Michigan statutes that Michigan alleges Kalshi violated (MCL § 432.413(1)(a)) include "imprisonment for not more than 10 years or a fine of not more than $100,000.00, or both."  MCL § 432.413(2).  The threat of prosecution is actual and imminent, Hickerson Decl. ¶¶ 12-13, especially in light of the

fact that Michigan has expressed an intention to pursue enforcement actions against entities beyond Kalshi.[13]

The harm to Robinhood's reputation caused by enforcement proceedings also could not be easily or quickly repaired. *Orgel*, 2026 WL 474869, at \*10; *Kalshi D.N.J.*, 2025 WL 1218313, at \*7; *ACT, Inc.*, 46 F.4th at 503-04. Abruptly discontinuing its Michigan customers' ability to open new sports-related event contract positions would undermine customers' confidence in Robinhood. Hickerson Decl. ¶ 18. Robinhood thus stands to lose the goodwill of over 50,000 customers in Michigan. *Id.* ¶ 14. This lost goodwill also constitutes irreparable harm. *Kalshi D.N.J.*, 2025 WL 1218313, at \*7; *see also Basicomputer Corp.*, 973 F.2d at 512.

Robinhood would also forgo significant business if it were to cease offering sports-related event contract trading in Michigan to avoid an enforcement action. Hickerson Decl. ¶ 17. These losses would be unrecoverable because sovereign immunity bars Robinhood from obtaining monetary damages. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999). Unrecoverable damages constitute irreparable harm. *See, e.g., Caspar v. Snyder*, 77 F. Supp. 3d 616, 641 (E.D. Mich. 2015) (stating that harms unrecoverable because of sovereign immunity are irreparable *per se*).

---

[13] *See* Complaint, *Nessel v. KalshiEX LLC*, 26-001087-CZ ¶ 5 ("*Entities like* Kalshi continue to circumvent the gaming prohibitions imposed by the Penal Code and LSBA.") (emphasis added); Michigan Gaming Control Board, *Michigan Gaming Control Board Opens Investigations Into Unlicensed Sports Prediction Markets* (Apr. 11, 2025), https://www.michigan.gov/mgcb/news/2025/04/11/michigan-gaming-control-board-opens-investigations-into-unlicensed-sports-prediction-markets (stating that the Michigan Gaming Control Board opened investigations into "unlicensed sports prediction markets operating within the state" and threatening to "take all necessary steps as deemed appropriate."); *March 5 Press Release* (reporting that Defendants allege sports-related event contracts constitute unlicensed gambling, and threatening that the Michigan Attorney General's Office will "hold those who sidestep Michigan's consumer protections accountable").

### III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN ROBINHOOD'S FAVOR.

"[T]he interests favor injunction" because Robinhood can demonstrate that Michigan law is likely preempted as to sports-related event contract trades through CFTC-designated contract markets.  *See Kalshi D.N.J.*, 2025 WL 1218313, at *7; *Orgel*, 2026 WL 474869, at *11. Robinhood "faces substantial expenses and reputational harm if it complies with [Michigan's] demands, or civil and criminal enforcement if it does not.  [Michigan], meanwhile, is likely to face no harm because . . . its enforcement in this case is likely preempted."  *Orgel*, 2026 WL 474869, at *11; *see also Kalshi D.N.J.*, 2025 WL 1218313, at *7 ("To find that the interests disfavor Kalshi—especially after determining that it has met its burden on the merits—would mean leaving it subject to state enforcement or obligating it to shift its business practices, consequences that are not cleanly undone.").  By contrast, Michigan and the public can have no interest in enforcing preempted state law against Robinhood.  *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025) (finding that the Michigan Gaming Control Board was not harmed by its inability to enforce preempted state licensing requirement); *Schoolcraft Mem'l Hosp. v. Mich. Dep't of Cmty. Health*, 570 F. Supp. 2d 949, 956 (W.D. Mich. 2008) ("[T]here is no need to protect state law and an associated state regulatory scheme if the law and scheme are preempted and therefore beyond the state's authority in the first place." (internal citation omitted)).

### IV.    NO SECURITY—OR ONLY *DE MINIMIS* SECURITY—IS APPROPRIATE.

Whether to require a bond, and the amount of any such bond, is left to the discretion of the Court.  *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp. 1168, 1181 (E.D. Mich. 1994), *aff'd*, 93 F.3d 243 (6th Cir. 1996).  Here, no security is needed because Defendants will not suffer any non-speculative harm.  *See Zahuranec v. Int'l Union United Auto., Aerospace, & Agric.*

*Implementation Workers of Am.*, No. 1:05-cv-1588, 2005 WL 1389255 (N.D. Ohio June 13, 2005) ("Because this temporary restraint will cause no discernible monetary damage to the defendants, the plaintiffs need not post security.")  Alternatively, any bond should not exceed $100,000—the maximum relevant fine.  MCL § 432.413(2).

## CONCLUSION

For the reasons set forth above, the Court should grant Robinhood's motion for a preliminary injunction.

24

DATED:  March 9, 2026

Respectfully submitted,

By:  _/s/ Andrew Goetz_

**MILLER JOHNSON**
Andrew Goetz (P71410)
500 Woodward Avenue, Suite 3600
Detroit, MI 48226
goetza@millerjohnson.com
(313) 435-2292

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan (*admission pending*)
aryan@cravath.com
Kevin J. Orsini (*admission pending*)
korsini@cravath.com
Brittany L. Sukiennik (*admission pending*)
bsukiennik@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

***Counsel for Plaintiff Robinhood
Derivatives, LLC***

## **CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to local Civil Rule 7.2(b)(ii), I hereby certify that the foregoing Brief in Support of Plaintiff Robinhood's Motion for a Preliminary Injunction contains 7,903 words, excluding items exempted by Local Civil Rule 7.2(b)(i). In making this certification, I have relied upon the word count of Microsoft Word version 2508, the word-processing system used to prepare the brief.

*/s/ Andrew Goetz*

Andrew Goetz