**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ROBINHOOD DERIVATIVES, LLC,

        Plaintiff,

        v.

DANA NESSEL, in her official capacity as
Attorney General of Michigan, *et al.*,

        Defendants.

No. 26-cv-00730-PLM-PJG

Hon. Paul L. Maloney

Mag. Phillip J. Green

**<u>DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

Page

Index of Authorities ........................................................................................................iii

Introduction ...................................................................................................................... 1

Background ........................................................................................................................ 3

Legal Standard ................................................................................................................. 7

Argument ........................................................................................................................... 8

I.     Robinhood is unlikely to succeed on the merits. ............................................... 8

    A.    Sports bets are not "swaps" or "contracts of sale of a commodity for future delivery" under the CEA. ....................................................... 9

        1.    Sports bets are not "swaps" because they are not financial instruments used to hedge existing financial risk. .................... 10

        2.    The statutory and regulatory context confirms sports bets are not "swaps." ................................................................. 13

        3.    Robinhood's argument is inconsistent with rudimentary principles of contract law. ......................................................... 14

        4.    A broad interpretation of "swaps" is inconsistent with Dodd-Frank's purposes and the CFTC's regulations. ............... 17

        5.    Sports bets are not "contracts of sale of a commodity for future delivery." ................................................................. 19

        6.    Robinhood's position would require all sports betting to be regulated *only* by the CFTC. .................................................... 20

    B.    The CEA does not preempt state gaming law. .................................... 21

        1.    There is no evidence that Congress intended to federalize sports betting. .......................................................................... 22

        2.    Express preemption does not apply. ......................................... 24

        3.    Field preemption does not apply. .............................................. 29

        4.    Conflict preemption does not apply. ......................................... 31

5.      Robinhood's view would require impliedly repealing other
        federal laws. ................................................................. 32

C.      The new CFTC Chair's speeches and briefs switching positions
        are not entitled to deference. .............................................. 33

II.     Robinhood failed to establish irreparable harm. ............................................. 35

III.    The balance of equities and the public interest favor the State
        Defendants. ............................................................................................. 37

Conclusion and Relief Requested ............................................................................. 43

Certificate of Compliance ......................................................................................... 44

Certificate of Service.................................................................................................. 45

# INDEX OF AUTHORITIES

Page

**Cases**

*Ah Sin v. Wittman,*
   198 U.S. 500 (1905) ........................................................................................ 8

*Altria Grp., Inc. v. Good,*
   555 U.S. 70 (2008) ..................................................................................... 9, 25

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.,*
   977 F.2d 1147 (7th Cir. 1992) ....................................................................... 30

*Am. Apparel & Footwear Assoc. v. Baden,*
   107 F.4th 934 (9th Cir. 2024) ....................................................................... 25

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................................. 30, 31

*Artichoke Joe's Cal. Grand Casino v. Norton,*
   353 F.3d 712 (9th Cir. 2003) ....................................................................... 8, 21

*BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.,*
   904 F.3d 755 (9th Cir. 2018) ......................................................................... 27

*Bond v. United States,* 572 U.S. 844 (2014) .................................................... 9, 23

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
   489 U.S. 141 (1989) ....................................................................................... 21

*CFTC v. Noble Metals Int'l, Inc.,*
   67 F.3d 766 (9th Cir. 1995) ............................................................................. 4

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Board,*
   162 F.4th 631 (6th Cir. 2025) .................................................................. 7, 9, 29

*Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Pub. Co.,*
   839 F.2d 1147 (6th Cir. 1988) .................................................................. 37, 38

*CSX Transp., Inc. v. Easterwood,*
   507 U.S. 658 (1993) ....................................................................................... 29

*D.T. v. Sumner Cnty. Schs.,*
   942 F.3d 324 (6th Cir. 2019) ......................................................................... 35

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ............................................................................... 35

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ............................................................................... 33

*Fednav, Ltd. v. Chester*,
   505 F. Supp. 2d 381 (E.D. Mich. 2007).................................................. 32

*Fenner v. Gen. Motors, LLC*,
   113 F.4th 585 (6th Cir. 2024) ......................................................... 29, 32

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ............................................................................... 26

*Greater New Orleans Broad. Ass'n, Inc. v United States*,
   527 U.S. 173 (1999) ..................................................................... 9, 22, 31

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982) ............................................................................... 21

*Hotel Emps & Rest Emps Int'l Union v Nev Gaming Comm'n*,
   984 F.2d 1507 (9th Cir 1993) ................................................................ 40

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) ............................................................................... 28

*Inv. Co. Inst. v. CFTC*,
   891 F. Supp. 2d 162 (D.D.C. 2012) ....................................................... 17

*John Doe Co. v. CFPB*,
   235 F. Supp. 3d 194 (D.D.C. 2017) ....................................................... 35

*KalshiEx LLC v. Flaherty*,
   No. 25-1922 (3d Cir. July 31, 2025) ...................................................... 24

*KalshiEX LLC v. Martin*,
   793 F. Supp. 3d 667 (D. Md. 2025) ................................................. passim

*KalshiEX, LLC v. Hendrick*,
   No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) . passim

*KalshiEX, LLC v. Schuler*, No. 2:25-CV-1165, 2026 WL 657004 (S.D. Ohio
   Mar. 9, 2026) ..................................................................... 3, 26, 29, 36

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................................... 34

iv

*Louisiana Pub. Serv. Comm'n v. F.C.C.*,
  476 U.S. 355 (1986) .................................................................................... 30

*Louisiana-Pac. Corp. v. James Hardie Bldg. Prods. Inc.*,
  No. 3:18-CV-00447-JPM, 2018 WL 7272047 (M.D. Tenn. Dec. 20, 2018).............. 37

*Massachusetts v. KalshiEX LLC*,
  2026 WL 188019 (Mass. Super. Ct. Suffolk Cnty. Jan. 20, 2026).................... 29, 30

*McNeilus Truck and Mfg., Inc. v. State of Ohio*,
  142 F.3d 435 (6th Cir. 1998) .................................................................... 36

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ....................................................................... 8, 22, 25

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ....................................................................... 5, 26, 31

*Mirion Techs. (Canberra), Inc. v. Sunpower, Inc.*,
  No. 2:17-CV-669, 2017 WL 5090436 (S.D. Ohio Nov. 6, 2017).............................. 37

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453, 486 (2018) ............................................................... passim

*N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control
  Bd.*,
  No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) .... 20, 22

*N. Am. Derivatives Exch., Inc. v. Nevada*,
  No. 25-7187 (9th Cir. Feb. 17, 2026) ....................................................... 34

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................ 7

*QCX LLC v. Nessel*,
  No. 1:26-cv-00710 (W.D. Mich. Mar. 10, 2026) ......................................... 10

*Rissetto v. Plumbers & Steamfitters Loc.
  343*, 94 F.3d 597 (9th Cir. 1996) ............................................................. 19

*Roberts v. Sea-Land Servs., Inc.*,
  566 U.S. 93 (2012) .................................................................................. 11

*Sackett v. EPA*,
  598 U.S. 651 (2023) ................................................................................ 24

v

*Slaney v. The Int'l Amateur Athletic Fed'n,*
    244 F.3d 580 (7th Cir. 2001) ...................................................................... 27

*Tarrant Reg'l Water Dist. v. Herrmann,*
    569 U.S. 614 (2013) .................................................................................... 16

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n,*
    322 F.3d 1039 (9th Cir. 2003) ...................................................................... 5

*United States v. Washington,*
    879 F.2d 1400 (6th Cir. 1989) ....................................................... 8, 22, 38

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................................. 8, 23

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .................................................................................... 22

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) .......................................................................................... 7

*Wyeth v. Levine,*
    555 U.S. 555 (2009) .................................................................................... 32

*Yates v. United States,*
    574 U.S. 528 (2015) ............................................................................. 11, 13

## Statutes

7 U.S.C. § 1a(18) ............................................................................................. 20

7 U.S.C. § 1a(19) ............................................................................................... 6

7 U.S.C. § 1a(19)(iv) ....................................................................................... 20

7 U.S.C. § 1a(36) ............................................................................................. 20

7 U.S.C. § 1a(47)(A) ..................................................................................... 5, 10

7 U.S.C. § 1a(47)(A)(i) .................................................................................... 10

7 U.S.C. § 1a(47)(A)(ii) .............................................................................. passim

7 U.S.C. § 1a(47)(A)(iii) .................................................................................. 10

7 U.S.C. § 1a(47)(A)(iv) .................................................................................. 10

vi

7 U.S.C. § 1a(47)(A)(v) ................................................................................... 10

7 U.S.C. § 1a(47)(A)(vi) .................................................................................. 10

7 U.S.C. § 1a(47)(B)(i) .................................................................................... 19

7 U.S.C. § 2(a) (1974) ....................................................................................... 5

7 U.S.C. § 2(a)(1)(A) ................................................................................ passim

7 U.S.C. § 2(e) ................................................................................... 6, 12, 20

7 U.S.C. § 5.......................................................................................................3

7 U.S.C. § 5(a) ................................................................................................ 31

7 U.S.C. § 6(a) ........................................................................................... 6, 31

7 U.S.C. § 6c(c) ............................................................................................... 20

7 U.S.C. § 7 (1936) ........................................................................................... 4

7 U.S.C. § 7a-2(c)(1)-(2) .................................................................................. 6

7 U.S.C. § 7a-2(c)(5) ................................................................................... 6, 29

7 U.S.C. § 7a-2(c)(5)(C)(i)(I) ........................................................................ 28

7 U.S.C. § 7a-2(c)(5)(C)(i)......................................................................... 13, 14

7 U.S.C. § 13.................................................................................................... 12

7 U.S.C. § 16(e)(2) ...................................................................................... 26, 29

7 U.S.C. § 16(h)(2).......................................................................................... 26

15 U.S.C. § 1261.............................................................................................. 25

15 U.S.C. § 2075(a) ........................................................................................ 25

15 U.S.C. § 3001(a)(1) .................................................................................... 22

17 C.F.R. § 40.11............................................................................................. 34

Wire Act, 18 U.S.C. § 1084 ...................................................................... 32, 33

18 U.S.C. § 1084(a) ........................................................................................ 33

Indian Gaming Regulatory Act,
  25 U.S.C. § 2701 *et seq.* ................................................................ 32, 33

25 U.S.C. § 2701(5) ............................................................................. 33

25 U.S.C. § 2710 .................................................................................. 33

The Professional and Amateur Sports Protection Act, 28 U.S.C § 3702 ..................... 3

30 U.S.C. § 1254(a) ............................................................................. 27

30 U.S.C. § 1254(g) ............................................................................. 27

2019 P.A. 149, Mich. Comp. Laws § 432.401 *et seq.* ................................................. 3

Mich. Comp. Laws § 432.402(d) ............................................................. 3

Mich. Comp. Laws § 432.405(1) ............................................................. 3

Mich. Comp. Laws § 432.410(3) ............................................................. 38

Mich. Comp. Laws § 432.410(4) ........................................................ 38, 39

Mich. Comp. Laws § 432.411 ................................................................. 39

Mich. Comp. Laws  §  432.412 ................................................................. 3

Mich. Comp. Laws § 432.414 ................................................................. 4

Mich. Comp. Laws §§ 432.415a ............................................................ 41

Mich. Comp. Laws § 432.416 ................................................................ 41

Pub. L. No. 74-675, § 3, 40 Stat. 1491 (1936) ........................................... 4

Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974) .................................... 4

Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010) ...................... 5

## Other Authorities

156 Cong. Rec. S5906-07 (July 15, 2010) .................................................. 6, 13, 17, 24

*Black's Law Dictionary* (12th ed. 2024) ..................................................... 4

Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and
  Consumer Protection Act* 3 (2017) ........................................................... 5

H.R. Rep. No. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N. .................................. 23

*Oxford English Dictionary* (2025) ....................................................................... 11

*Webster's New World Collegiate Dictionary* .................................................... 11

**Rules**

Mich. Admin. Code R 432.745 ............................................................................. 38

Mich. Admin. Code R 432.752 ....................................................................... 3, 40

Mich. Admin. Code R 432.753 ....................................................................... 3, 40

Mich. Admin. Code R 432.754 ....................................................................... 3, 40

Mich. Admin. Code R 432.759 ....................................................................... 3, 40

Mich. Admin. Code R 432.772 ....................................................................... 3, 40

Mich. Admin. Code R 432.774 ....................................................................... 3, 40

W.D. Mich. L. Civ. R. 7.2 ................................................................................. 44

**Regulations**

17 C.F.R. § 1.3 .................................................................................................... 18

17 C.F.R. § 33.3(a) .............................................................................................. 20

17 C.F.R. § 38.4(b) .............................................................................................. 19

17 C.F.R. § 40.11(a) ..................................................................................... passim

17 C.F.R. § 40.2(a)(2) ........................................................................................... 6

17 C.F.R. § 40.2(c) ................................................................................................ 6

Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01 (July 27, 2011) ............................................................................................................... 14

Definition of "Swap," 77 Fed. Reg. 48208-01 (Aug. 13, 2012) .................................. 18

Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024), *withdrawn,* 91 Fed. Reg. 5386 (Feb. 6, 2026) ........................................ 6, 31, 34, 35

## INTRODUCTION

Robinhood's complaint arises exclusively from the Kalshi offerings it makes available on its platform.  Robinhood discusses a Kalshi alternative, that it may use in the future, but Robinhood cannot stack hypotheticals of possible future events and claim that enforcement is imminent.  This action simply seeks to end-run the State's preexisting enforcement action against Kalshi, which is subject to a pending motion to remand.

As with its cohorts, Robinhood's fundamental arguments all hinge on a single idea: that although Congress called it the "Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010," with the goal of preventing the excessive risk-taking that led to the 2008 financial crisis, this Court should instead consider Dodd-Frank to be an implied "Interstate Sports Betting and Gambling Act."  As described below, both the text of the Commodity Exchange Act (CEA) and the context of its 2010 Dodd-Frank amendments—that brought previously unregulated "swaps" under the regulation of the Commodity Futures Trading Commission (CFTC)—reveal that is not true.

Robinhood also fails to mention that CFTC regulations categorically prohibit trading on "designated contract markets" (DCMs)  contracts "that involve[], relate[] to, or reference[]" "gaming."  17 C.F.R. § 40.11(a).  Despite its recent claims to this court that it is "not a sportsbook" (No. 1:26-cv-00731, PageID.167, n.3), Kalshi classified itself as "gambling" and offering "bookmaking services . . . related to sports

1

betting" in its trademark request.[1]    Robinhood has also failed to demonstrate irreparable harm or that its supposed harm outweighs that of the public.

For the reasons discussed below, the Court should deny Robinhood's Motion for a Preliminary Injunction.

---

[1] Dan Bernstein, *Kalshi Classifies Itself as 'Gambling' in Federal Trademark Request*, Sportico (Apr. 2, 2026) https://www.sportico.com/business/sports-betting/2026/kalshi-gambling-trademark-request-prediction-market-1234888955/.

## BACKGROUND

**Michigan comprehensively regulates sports betting to protect the public interest.**

In 2018, the Supreme Court issued its ruling in *Murphy* overruling PASPA[2] and permitting states to legalize sports wagering within their boundaries. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018). The Michigan Legislature authorized internet sports betting via the Lawful Sports Betting Act (LSBA),[3] to establish a "secure, responsible, fair, and legal system of internet sports betting" to "protect residents" and "capture revenue" in the form of taxes and payments. Mich. Comp. Laws § 432.402(d).[4]

LSBA vests the Michigan Gaming Control Board (MGCB) with the authority to regulate sports betting. Mich. Comp. Laws § 432.405(1). In addition to precluding access to anyone under the age of 21, the MGCB operates a statewide self-exclusion program, and each licensed sports betting operator is required to offer various responsible gaming tools.[5] The MGCB actively enforces these responsible gaming provisions as a core part of its mission.

---

[2] The Professional and Amateur Sports Protection Act, 28 U.S.C § 3702.

[3] 2019 P.A. 149, Mich. Comp. Laws § 432.401 *et seq.*

[4] By contrast, the CEA's purpose is "to serve the national public interest of 'managing and assuming price risks, discovering prices, or disseminating pricing information' by establishing a system to deter market disruptions, ensure financial integrity, avoid systemic risk, protect market participants from fraud and abuse, and promote responsible innovation." *KalshiEX, LLC v. Schuler*, No. 2:25-CV-1165, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026) (quoting 7 U.S.C. § 5).

[5] Mich. Comp. Laws § 432.412; Mich. Admin. Code R 432.752, R 432.753, R 432.754, R 432.759, R 432.772, & R 432.774.

Non-Tribal sports betting operators must pay taxes on gross revenues derived from sports betting activities.  Mich. Comp. Laws § 432.414.  For January 2025 through November 2025, internet sports wagering delivered over $22 million in revenue to the State and over $7 million in revenue to the City of Detroit.  *2025 Internet Sports Betting Revenues and Wagering Tax Information*, Michigan Gaming Control Board, https://tinyurl.com/542px2sx.

**The CFTC regulates commodity futures trading.**

The CFTC regulates trading in commodity derivatives—financial instruments that companies use to manage risk.  It has never regulated sports betting, and indeed has prohibited gaming on its markets.

In 1936, Congress enacted the CEA to regulate trading in futures in wheat, corn, and other agricultural commodities.  Pub. L. No. 74-675, § 3, 40 Stat. 1491 (1936).  A "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date.  *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995).  Businesses use futures to hedge against price volatility.  *Id.*  The CEA initially authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading.  7 U.S.C. § 7 (1936).

In 1974, Congress expanded the CEA to cover nearly all commodities, including non-agricultural commodities, and to cover other derivatives.  Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974).  A "derivative" is a contract whose value depends on the performance of an underlying asset, such as a commodity.  *Black's Law Dictionary* (12th ed. 2024).

Also in 1974, Congress created the CFTC "to consolidate federal regulation of commodity futures trading" in one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982). Congress gave the CFTC "exclusive jurisdiction" over futures and options that are traded on DCMs or other markets. *Id.*; *see* 7 U.S.C. § 2(a) (1974).

In 2010, Congress enacted the Dodd-Frank Act in response to the financial crisis. *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010). In it, Congress expanded the CEA to cover "swaps."[6] *Id.* § 722, 124 Stat. at 1672. A "swap" is an agreement between two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042-43 (9th Cir. 2003). Congress added "swaps" to the CEA because certain swaps, known as "credit default swaps," had exacerbated the financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 3 (2017). To capture the various forms of swaps in the market, Congress provided a detailed, six-part definition of "swap." 7 U.S.C. § 1a(47)(A).

The Dodd-Frank revisions also changed the term "commodity" to include, so-called "excluded commodities," a category that includes currency and interest rates; macroeconomic, stock, and other indices that are "measure[s] of economic or commercial risk, return, or value;" "economic or commercial ind[icies]" that "are not

---

[6] Although the CEA does not define the relevant parts of the term "swap" in terms of excluded commodities, they are effectively derivatives in excluded commodities.

5

within the control of any party to the relevant contract;" and other "occurrence[s]" that are "associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19).  This category is so named because Congress *excluded* them from the CFTC's authority in 2000—a decision it reversed in 2010.

If a consumer contract qualifies as a swap, option, or future, it can *only* be traded on a CFTC-registered DCM, and nowhere else.  *See* 7 U.S.C. § 2(e) (swaps); *id.* § 6(a) (futures); 17 C.F.R. § 33.3(a) (options).

To offer a contract for trading, a DCM can self-certify that the contract complies with the CEA and start trading the next day, without any action by the CFTC.  7 U.S.C. § 7a-2(c)(1)-(2); *see* 17 C.F.R. § 40.2(a)(2).  The CFTC can review a self-certification and disallow a contract that fails to comply with the CEA's requirements.  *See* 17 C.F.R. § 40.2(c).

Congress did not want sports betting to occur on DCMs.  *See, e.g.*, 156 Cong. Rec. S5906-07 (July 15, 2010).  To that end, it enacted the "Special Rule," which authorizes the CFTC to disallow contracts that involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or (as relevant here) "gaming."  7 U.S.C. § 7a-2(c)(5).

The CFTC has long recognized that it is not a gaming regulator and that gaming should not occur on DCMs.  The CFTC previously explained that it "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee" gaming.  Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024), *withdrawn*, 91 Fed. Reg. 5386 (Feb. 6, 2026).  Further, under the Special Rule,

6

the CFTC promulgated a regulation that categorically prohibits trading on DCMs contracts "that involve[], relate[] to, or reference[]" "gaming."  17 C.F.R. § 40.11(a).  Although the CFTC now claims the authority to regulate sports betting, (PageID.65, n.5), that is an abrupt about-face, and its regulation prohibiting gaming on DCMs remains on the books.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary equitable remedy that serves to preserve the relative positions of the parties until a trial on the merits can be held." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631, 637 (6th Cir. 2025) (hereinafter, *Churchill Downs*) (cleaned up).  To obtain one, Robinhood "must establish" each of the four factors set out in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008): (1) it is likely to succeed on the merits; (2) it likely will suffer irreparable harm without a preliminary injunction; (3) the balance of equities favors it; and (4) an injunction is in the public interest.  *Churchill Downs*, 162 F.4th at 637, 642.  Where the party opposing injunctive relief is a government entity, the potential hardship and the public interest considerations are merged.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).   Courts should pay particular attention to the public consequences when considering a request for injunctive relief.  *Winter,* 555 U.S. at 24.

7

## ARGUMENT

### I.    Robinhood is unlikely to succeed on the merits.

To prevail on the merits, Robinhood must show both that: (1) its sports bets are swaps (or other commodity derivatives) under the CEA so that the CEA even applies, and (2) if the CEA applies, Congress intended to preempt all state gaming law as to those contracts.  Robinhood cannot show either.

Robinhood's position requires the Court to believe that Congress decided in Dodd-Frank to give the CFTC all authority to regulate sports betting, to the complete exclusion of the States and Tribes, and that no one recognized it for over a decade—not even the Supreme Court in *Murphy*. *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 683 (D. Md. 2025).

Courts presume that Congress did not preempt state law, "particularly" in cases involving "a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted).  Courts also require Congress to speak clearly when it gives an agency authority to regulate an issue of "vast economic and political significance," especially when the agency "claim[s] to discover" a new power in "a long-extant statute." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022) (internal quotation marks omitted).

The regulation of gaming "lie[s] at the heart of the state's police power." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 740 (9th Cir. 2003); *see Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989).  Federal law "defer[s] to, and even promote[s]

8

differing gambling policies in different States."  *Greater New Orleans Broad. Ass'n, Inc. v United States*, 527 U.S. 173, 187 (1999).

Robinhood thus would need to show exceptionally clear congressional intent to preempt state gaming law.  *Bond v. United States*, 572 U.S. 844, 858-59 (2014).  If the CEA "is susceptible of more than one plausible reading," this Court should "accept the reading that disfavors pre-emption."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation marks omitted).  Nothing in the CEA shows the necessary intent.

Because Robinhood fails to establish that it is likely to prevail on the merits, the Court should deny the Motion.  *See Churchill Downs*, 162 F.4th at 637, 642.

### A. Sports bets are not "swaps" or "contracts of sale of a commodity for future delivery" under the CEA.

Robinhood's federal preemption claim rises or falls on whether Kalshi's sports betting contracts (while accessible through the Robinhood platform, "all actual trades occur on Kalshi's CFTC-regulated exchange" (PageID.71) are "swaps or contracts of sale of a commodity for future delivery" as defined under the CEA, specifically an "excluded commodity."  (PageID.75.)  Section 2(a)(1)(A) gives the CFTC "exclusive jurisdiction" over certain listed commodity derivatives, including "swap[s]," that are "traded or executed on [a DCM]" or "any other" market.  7 U.S.C. § 2(a)(1)(A).  If a contract is not one of the listed commodity derivatives, Section 2(a)(1)(A) simply does not apply, and "federal law does not stand in the state's way."  Opinion and Order Denying Plaintiff's Motion for a Temporary Restraining Order, *QCX LLC v. Nessel*,

No. 1:26-cv-00710, ECF No. 17 at PageID.232 (W.D. Mich. Mar. 10, 2026) (*Order Denying TRO*).

### 1. Sports bets are not "swaps" because they are not financial instruments used to hedge existing financial risk.

The CEA's definition of "swap" reflects that swaps are financial instruments used to hedge existing financial risk. 7 U.S.C. § 1a(47)(A). The definition contains six parts, all of which refer to specific financial measures, indices, or instruments used to hedge risk. Parts (i), (iii), and (v) list specific financial instruments that involve "financial or economic interests" such as "interest or other rates, currencies, commodities, [or] securities . . . or property of any kind." 7 U.S.C. § 1a(47)(A)(i), (iii), (v). Part (iii) further lists 22 specific "commonly known" swaps, *id.* § 1a(47)(A)(iii), and part (v) covers certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security," *id.* § 1a(47)(A)(v). Part (iv) covers any contract "that is or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). And part (vi) covers any contract "that is any combination or permutation" of contracts in the five previous parts. *Id.* § 1a(47)(A)(vi). These all concern financial instruments that are used to hedge risk and are recognized as swaps.

Robinhood relies on part (ii) which covers a "contract . . . that provides for any . . . payment . . . that is dependent on the occurrence [or] nonoccurrence, or the extent of the occurrence . . . of an event or contingency . . . associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Robinhood

10

seeks to give this definition its broadest possible reading, to reach contracts on "any and all things that happen." *See Order Denying TRO*, No. 1:26-cv-00710, PageID.231.

But courts do not interpret individual definition provisions in isolation and as expansively as possible. *See Yates v. United States*, 574 U.S. 528, 543-44 (2015). Instead, they read "the words of a statute . . . in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Here, part (ii) should be read in context to also cover financial instruments based on economic events that are used for hedging risk. *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *7 (D. Nev. Nov. 24, 2025); *see Yates*, 574 U.S. at 543-44 (*noscitur a sociis* canon).

A key textual limitation is that the event or contingency must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). These limitations ensure that the definition captures contracts on occurrences that create risks against which businesses would want to hedge—such as whether a company's bond defaults.

This requirement limits qualifying events to those where there is an existing economic risk that companies seek to hedge. "Potential" reflects that the consequences may or may not occur—they "can, but ha[ve] not yet," happened. *Webster's New World Collegiate Dictionary at* 1126. "Associate" means to "connect" or "join together" or to "connect in the mind." *Id.* at 86; *see Oxford English Dictionary* (2025), perma.cc/EW6F-NPP2 ("[t]o connect in idea"); *Hendrick*, 2025 WL 3286282, at *6. Events that are "associated with" potential economic consequences are those

11

that are "inherently joined or connected with" those consequences. *Id.* They have potential economic consequences "without looking at externalities like potential downstream financial consequences." *Id.*

A sports bet does not hedge against existing risk; it creates the risk. Who wins a sports game generally does not have any direct economic consequence that someone would wish to hedge against. The exception might be Robinhood's example of "the teams, the owners," (PageID.76) and other similar insiders, but they cannot bet on their own games.

Robinhood offers only hypothetical examples (PageID.77); it does not present any evidence that any person in the real world actually uses sports bets to hedge against risk, as opposed to gamble for entertainment. And the supposed economic consequences are either attenuated or nonexistent.

Robinhood's position is that because every event has some possible downstream economic consequence, every event contract qualifies as a "swap." Its view "knows no limiting principle." *Hendrick*, 2025 WL 3286282, at *6.

As the *Hendrick* court explained, every event "might have some conceivable financial consequence if one is creative enough." *Id.* For example, two parents betting on which team wins a Little League game would qualify as a "swap" under Robinhood's view, because the winning team might eat a celebratory dinner at its favorite restaurant. And because all consumer swaps must be traded on DCMs, the parents would be federal felons. 7 U.S.C. §§ 2(e), 13. Robinhood's definition of "swap" cannot be correct.

12

### 2.    The statutory and regulatory context confirms sports bets are not "swaps."

Robinhood's reading of part (ii) of the "swap" definition makes no sense in context.  First, it ignores that every other part of the "swap" definition concerns financial instruments used to hedge economic risk.  *Hendrick*, 2025 WL 3286282, at *7.  Further, it makes the rest of the definition superfluous—if part (ii) reaches contracts "on anything that happens or could happen," then the remaining parts are left with nothing to do.  *Id.* at *6.

This case is just like *Yates*, where the Supreme Court refused to adopt a broad definition of "tangible object" because it was an "unbounded reading" that made no sense in context and would "render superfluous" other key statutory language. 574 U.S. at 546.

Special Rule confirms that "swaps" should not be interpreted to allow sports betting and other gambling.  The Special Rule is a safety-valve provision that allows the CFTC to ban contracts that are contrary to the "public interest," not an acknowledgment that the CFTC regulates gaming.  7 U.S.C. § 7a-2(c)(5)(C)(i). Congress did not want sports betting on DCMs.  *See* 156 Cong. Rec. S5906-07.  So, in the Special Rule, Congress gave the CFTC authority to ban contracts involving "gaming" from DCMs.  7 U.S.C. § 7a-2(c)(5)(C)(i).  Notably, the Special Rule is not limited to "swaps"; it applies to "agreements, contracts, transactions, or swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i).

Notably, the Special Rule is not limited to gaming, but also applies to contracts involving "war," "assassination," and "terrorism."  *Id.*  It does not show that Congress

13

intended for the CFTC to regulate gaming generally, any more than war, assassinations, or terrorism.   Further, the Special Rule allows the CFTC to bar contracts involving conduct that is "unlawful" under "State law." *Id.* That "reflects an affirmative intent to *preserve* state laws," rather than supplant them.  *Martin*, 793 F. Supp. 3d at 680.

In any event, the CFTC has exercised its authority under the Special Rule to categorically *ban* contracts involving "gaming" on DCMs.  17 C.F.R. § 40.11(a).  The CFTC did that specifically to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01, 44786 (July 27, 2011) (internal quotation marks omitted).  The terms of the regulation are clear and unequivocal: DCMs "shall not list" any contracts that "involve[], relate[] to, or reference[]" "gaming."   17 C.F.R. § 40.11(a).  Robinhood *never even mentions* this regulatory prohibition in its brief.

### 3.    Robinhood's argument is inconsistent with rudimentary principles of contract law.

The text indicates the "event" with which a "financial, economic or commercial consequence" must be "associated" in order to make a contract a swap is limited to the event "provid[ed] for" in the relevant "contract" referenced at the beginning of Rule 1a(47)(A)(ii).  Plaintiff argues that sports contracts satisfy this requirement due to the downstream economic effects of sporting events that result from—but are not identical to—the sports events themselves.   For example, Plaintiff suggests

14

(PageID.77) that "wins can increase franchise value, leading to more ticket sales, more revenue from sponsorships, merchandise, parking," etc.[7]

In other words, by its own terms, the definition of "swap" in Rule 1a(47)(A)(ii) is limited to the financial, economic or commercial consequences *within* "an event" (singular) described in a specific "contract" (also singular).  A reading of Rule 1a(47)(A)(ii) that includes financial, economic, or commercial consequences outside of the "event" described in the relevant event "contract" is foreclosed by the language of the rule itself.  *See Order Denying TRO*, No. 1:26-cv-00710, PageID.232 (rejecting argument that the phrase "associated with a potential financial, economic, or commercial consequence" in Rule 1a(47)(A)(ii) includes "potential consequences dependent on the reactions of parties outside the game").

This reading of Rule 1a(47)(A)(ii) is also required by rudimentary principles of contract law.  If downstream economic effects were part of the bets that event contracts are intended to memorialize, then why would the parties not make them an express term of the contract itself?  For example, "the Detroit Lions's valuation will increase by more than 2% if they win the Super Bowl."  Basic rules of contract interpretation dictate that if a specific downstream economic effect is not expressly provided for in the relevant sports-event contract itself, then the Court must assume that the parties to the contract did not intend it to be part of their agreement.  *See*

---

[7] Robinhood provides no explanation for proposition and parlay-style bets, which included things like "the coin toss" or "the color of the Gatorade poured on the winning team."

*Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 628 (2013) ("[A]s with any contract," the Court should "begin by examining the express terms of the Compact as the best indication of the intent of the parties."). For this additional reason, the Court should reject the downstream-effect rationale on which Plaintiff's interpretation of the term "swap" in CFTC Rule 1a(47)(A)(ii) depends.

But if Robinhood's definition of swap is at odds with the text and principles of contract interpretation, then why would Robinhood ask the Court to adopt it? The following graph[8] reflecting the trading volume of Kalshi tells the story:



There is a mismatch in Robinhood's hypotheticals between the people doing the betting and the implied hedging purposes for insiders, retailers, or other businesses.

---

[8] Sam Learner, *Prediction markets barely make money; sportsbooks make money*, Financial Times (Dec. 19, 2025) https://www.ft.com/content/1ac03f57-bd5d-4196-85ff-4bd96dc69e0d.

16

But Robinhood's sports bettors are not retailers or businesses—and based on Kalshi's rules, they are not supposed to be insiders—they are individuals betting on games for entertainment.

### 4.    A broad interpretation of "swaps" is inconsistent with Dodd-Frank's purposes and the CFTC's regulations.

Interpreting "swap" to cover sports betting is not consistent with Congress's purposes in enacting the Dodd-Frank Act.  Congress added "swaps" to the CEA to strengthen regulation of financial markets following the 2008 financial crisis, because unregulated credit default swaps had exacerbated the crisis.  *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 172-73 (D.D.C. 2012).  Congress "aimed Dodd-Frank at systemic risks in the financial sector that undermined U.S. financial stability." *Hendrick,* 2025 WL 3286282 at *7.

The Dodd-Frank Act was not about regulating sports or election betting. "Congress was bringing risky financial products out of the shadows," not "enabling nationwide gambling." *Id.* at *9.  Sports betting did not contribute to the financial crisis; indeed, at the time, it was illegal everywhere but Nevada.  *See Murphy*, 584 U.S. at 462.

Notably, the only mention of sports betting in the legislative history makes clear that Congress did *not* want that gambling to occur on CFTC-regulated DCMs. *See* 156 Cong. Rec. S5906-07 (colloquy between Senators Feinstein and Lincoln explaining that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf

17

Tournament"—but that "[t]hese types of contracts would not serve any real commercial purpose.  Rather, they would be used solely for gambling.").  Thus, Congress recognized that sports bets are not swaps and did not want sports betting on DCMs.

Further, the CFTC's own regulations reject a maximalist reading of "swap."  In 2012, it promulgated a regulation defining "swap" to exclude "consumer and commercial arrangements that historically have not been considered swaps"—such as "traditional insurance products," "mortgages," "automobile loans," and "employment contracts."  Further Definition of "Swap," 77 Fed. Reg. 48208-01, 48212, 48246-50 (Aug. 13, 2012); *see* 17 C.F.R. § 1.3.  The CFTC explained that those contracts historically were regulated by States, and that there was no indication that Congress "intended" for those contracts "to be regulated as swaps."  77 Fed. Reg. at 48212 & n.29; *see id.* at 48246.

That reasoning applies equally to sports bets.  Sports bets do "not involve risk-shifting arrangements with financial entities"—the hallmark of a swap.  77 Fed. Reg. at 48248.  They are consumer transactions that people enter into "primarily for personal [entertainment] purposes" and that "historically have not been considered to involve swaps."  *Id.* at 48246-47.  Like insurance and mortgages, sports bets historically have been regulated by the States.  *Murphy*, 584 U.S. 484.  There is no indication that Congress intended for them to be regulated as "swaps."

### 5.    Sports bets are not "contracts of sale of a commodity for future delivery."

Robinhood should be estopped from making this alternative argument because Kalshi told the CFTC that all of its contracts are "swaps," and Robinhood is only acting as an intermediary for Kalshi's products.[9]  When a DCM self-certifies a new contract for trading, it must identify whether the contract is a swap, option, or future. *See* 17 C.F.R. § 38.4(b).  The statutory definition of "swap" expressly excludes futures and certain options, *see* 7 U.S.C. § 1a(47)(B)(i), and the CFTC has different certification requirements for each, *see* 17 C.F.R. pt. 38, App'x C.

Kalshi self-certified its sports event contracts as "swaps"—not options or futures—in order to list them for trading.  CFTC, *Designated Contract Market Products—CDNA*, bit.ly/4rMmKUO (visited Apr. 15, 2026).  Robinhood/Kalshi cannot now make a contrary argument to this Court. *See Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 604 (9th Cir. 1996).

In any event, Robinhood's argument is incorrect.   Both of Robinhood's alternative arguments, that sports bets are "options" and "contracts of sale of a commodity for future delivery,"  require the subject of the contract to be an "excluded commodity"[10] that was added to the CFTC's jurisdiction by Dodd-Frank.  7 U.S.C.

---

[9] Robinhood cannot use a hypothetical substitute DCM provider (PageID.71) in order to stack hypothetical upon hypothetical, while claiming its harm is "imminent."

[10] The occurrence or contingency also must be "beyond the control of the parties to the contract" (PageID.75; citing 7 U.S.C. § 1a(19)(iv)), which is not the case in Robinhood's example of the financial consequences for "the players, the teams, the owners," (PageID.76) etc. that do have control over the outcome of a game.

19

§ 1a(36); 7 U.S.C. § 1a(19)(iv).  Robinhood asserts that its contracts involve "excluded commodities," but the relevant definition of "excluded commodity" requires "an occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).  As just explained, Robinhood/Kalshi's sports bets do not satisfy that requirement.  *See supra* at 11-12; 14-16.  Therefore, Robinhood/Kalshi's sports bets do not involve commodities under the CEA.

### 6.    Robinhood's position would require all sports betting to be regulated *only* by the CFTC.

Section 2(e) makes it "unlawful" for "any person" to "enter into a swap" unless that swap "is entered into on, or subject to the rules of, a [DCM]," except when both parties are regulated financial institutions, major corporations, or similar entities. 7 U.S.C. § 2(e); *see id.* § 1a(18).  Similarly, Section 6c(c) directs the CFTC to issue regulations requiring all options be traded on DCMs, 7 U.S.C. § 6c(c), which it has done, *see* 17 C.F.R. § 33.3(a).  So all consumer sports betting would have to be done on DCMs.  That would make the CFTC the Nation's sole regulator of sports betting. And the state-licensed sportsbooks operating without DCM registrations (which is to say, all of them), along with their millions of customers, would be felons under federal law. *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *9, n. 12 (D. Nev. Oct. 14, 2025) (hereinafter *Crypto.com*); *see Hendrick*, 2025 WL 3286282 at *8.

20

To reach that outcome, the Court would have to believe that when Congress added "swaps" (or options) to the CEA, it intended to take away the longstanding police power of the States and Tribes to regulate sports betting, *see Artichoke Joe's*, 353 F.3d at 737, and give it all to the CFTC.  And the way Congress supposedly did this was by allowing the CFTC to decide company-by-company how much sports betting to allow, based on which DCMs it certifies and which contracts it chooses to review.  Then apparently no one noticed this sea change until 2025, when companies like Kalshi decided to offer sports betting for the first time.  And the Supreme Court's decision in *Murphy*, which recognized and reinforced the States' power to regulate sports betting, 584 U.S. at 484, would be meaningless.  This Court should not interpret the CEA to produce those absurd results.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

### B.    The CEA does not preempt state gaming law.

Even if Robinhood/Kalshi's sports contracts qualify as swaps or options, the CEA does not preempt application of state gaming law to them.  As discussed below, the plain language of the CEA and the CFTC's rules leaves no doubt that state law does not "conflict with the federal law" in the first place, and so no basis for preemption exists under any of the three theories.  *Martin*, 605 U.S. at 410 (where a federal statute "incorporates state law, in most cases there is no conflict for the Supremacy Clause to resolve"); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal

21

interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them.") (cleaned up).

### 1. There is no evidence that Congress intended to federalize sports betting.

Courts "start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (internal quotation marks omitted). There is no indication that Congress sought to preempt all state gaming law and make the CFTC the Nation's sole sports-betting regulator. "Had Congress intended such a sea change in the regulatory landscape, it surely would have said so," because Congress does not " hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see Hendrick*, 2025 WL 3286282 at \*8; *Martin*, 793 F. Supp. 3d at 684.

Federalizing sports betting would massively upset the federal-state balance. Gaming is a longstanding area of state regulation, *see Washington*, 879 F.2d at 1401, and federal law historically has respected state authority in this field, *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185. "[T]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). Yet the "necessary implication" of Robinhood's position is that all sports wagers can be regulated only by the CFTC. *Crypto.com*, 2025 WL 2916151 at \*9. Congress does not make major changes to the "usual

constitutional balance of federal and state powers" without clearly saying so.  *Bond v. United States*, 572 U.S. 844, 858-59 (2014) (cleaned up).

Further, federalizing sports betting would have "vast economic and political" consequences.  *West Virginia*, 597 U.S. at 716 (internal quotation marks omitted). Sports betting is a $14-billion-a-year industry that is both "controversial" and "immensely popular."  *Murphy*, 584 U.S. at 460, 484; Am. Gaming Ass'n*, State of the States 2025, at 85 (May 13, 2025), perma.cc/J27S-WLSB (AGA, States).*  Thus, under the major-questions doctrine, there would need to be "clear congressional authorization" for the CFTC to take exclusive regulation of sports betting.  *West Virginia*, 597 U.S. at 732 (internal quotation marks omitted).  That does not exist.

Robinhood claims that the (PageID.78-79) legislative history supports  that Congress intended the CEA to field preempt certain state regulation of trading in commodity derivatives.  But none of that history shows an intent to preempt state regulation of *sports betting*.  *See Martin*, 793 F. Supp. 3d at 682. With only one exception, Plaintiff cites to pre-Dodd-Frank authority.

Notably, even the pre-Dodd-Frank history cited does not fully support Robinhood's proposition. The Conference Committee statement that Robinhood relies (PageID.78) on acknowledges a limit to preemption, "[t]herefore, if any substantive State law regulating futures trading was *contrary to or inconsistent with* Federal law, the Federal law would govern."  H.R. Rep. No. 93-1383, at 35–26 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.  This statement demonstrates that the

23

Committee considered that state law may be *conflict* preempted, but not *field* preempted. *See supra* at <mark>32</mark>.

Notably, the only mention of sports betting in the legislative history comes during the relevant Dodd-Frank legislation and makes clear that Congress did not want that gambling to occur on CFTC-regulated DCMs. See 156 Cong. Rec. S5906-07 (Senators explaining that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament"—but that "[t]hese types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.").[11]

Robinhood cannot meet its burden to show that Congress specifically considered sports betting and chose to override all state gaming regulation.

### 2.   Express preemption does not apply.

Robinhood argues (PageID.74) that the CEA expressly preempts Michigan gaming law. It relies on Section 2(a)(1)(A), the CEA's "exclusive jurisdiction" provision, taking the most expansive view of that provision possible. But courts do not read statutory provisions in isolation, *Sackett v. EPA*, 598 U.S. 651, 674 (2023), or read supposedly preemptive provisions expansively, *Altria Grp., Inc. v. Good*,

---

[11] The amicus brief submitted by former Senator turned *Kalshi's lobbyist* that Robinhood cites (PageID.79) is not persuasive. Brief of Amici Curiae Seven Former Members of Congress in Support of Plaintiff Appellee, *KalshiEx LLC v. Flaherty*, No. 25-1922, ECF No. 66, p. 2, n. 2 (3d Cir. July 31, 2025).

24

555 U.S. 70, 77 (2008), especially in areas of traditional state regulation, *Medtronic*, 518 U.S. at 485.[12]

Section 2(a)(1)(A) is not an express-preemption provision. Congress expressly preempts state law "by enacting a clear statement to that effect." *Am. Apparel & Footwear Assoc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024) (internal quotation marks omitted). That is, the provision must say, in so many words, that state law is preempted or that state authorities may not act. *See, e.g.*, *id.* (citing 15 U.S.C. § 1261 note (b)(1)(B) and 15 U.S.C. § 2075(a), which provide that "no State or political subdivision of a State" may "establish" a product-safety standard different from a federal standard).

As relevant to Plaintiff's Motion, 7 U.S.C. § 2(a)(1)(A) provides:

> The Commission shall have exclusive jurisdiction, *except* to the extent otherwise *provided in [Dodd-Frank]*. . . with respect to accounts, agreements . . ., and transactions involving *swaps or contracts of sale of a commodity for future delivery* . . . traded or executed on a contract market designated pursuant to section 7 of this title. *Except as hereinabove provided*, *nothing contained in this section shall* . . . *supersede or limit the jurisdiction* at any time conferred on . . . other regulatory authorities under the laws of . . . any *State* or . . . restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with *such laws*. [Emphasis added.]

As shown above, Section 2(a)(1)(A) describes the jurisdiction of the CFTC but does not take away jurisdiction from the States. As the Supreme Court explained,

---

[12] Robinhood argues (PageID.64, n.4) that courts should not apply the presumption against preemption to express-preemption provisions. But the Supreme Court has done so. *See, e.g.*, *Altria*, 555 U.S. at 70.

Congress enacted this provision "only to consolidate federal regulation of commodity futures trading in the [CFTC]"—that is, to "separate the functions of the [CFTC] from those of the [SEC]" and other federal agencies.  *Merrill Lynch*, 456 U.S. at 386-87.

Notably, the CEA contains other provisions that *do* expressly preempt state law.  Those provisions confirm that Congress knew how to enact express-preemption provisions in the CEA, and that it did *not* do so with respect to state gaming law generally.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995).

One such provision states that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" with respect to only specific products, but does not include swaps.  7 U.S.C. § 16(e)(2).  That provision would be superfluous if the exclusive-jurisdiction provision already preempted state gaming law.  *See Schuler*, 2026 WL 657004 at *8 (observing that the types of preempted "gaming" enumerated in 7 U.S.C. § 16(e)(2) do not include sports-event contracts, which is " 'strong evidence' that Congress did not intend the CEA to preempt state sports gambling laws") (quoting *Martin*, 793 F. Supp. 3d at 681).  Further, it shows that Congress specified exactly what it wanted to preempt when it comes to gaming—and it was *not* all gaming law.

The other express-preemption provision preempts state insurance law: It says that a swap "may not be regulated as an insurance contract under the law of any State."  7 U.S.C. § 16(h)(2).  Robinhood essentially wants the Court to read into the CEA an equivalent provision for gaming, but the CEA conspicuously does not contain that provision.

26

First, it cites (PageID.74-75) two decisions where "exclusive jurisdiction" supposedly means preemption.  Neither support Robinhood's argument. One of the cases[13] cited by Robinhood directly undermines its argument.  It is a railroad case in which the court clarified that the statute "*does not preempt state or local laws* if they are laws of general applicability that do not unreasonably interfere with interstate commerce." *BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018) (cleaned up).  The Court in that case also refused to expand the general "exclusive jurisdiction" language to impliedly repeal another federal statute that preserved the role of "traditional state regulation" to "protect residents from physical and environmental hazards."  *Id.* at 766-67.  Gambling is an area of traditional state regulation, and Robinhood's position would mean an implied repeal of the Wire Act and IGRA.  *See infra* at 33.

Notably, other statutes that *do* use "exclusive jurisdiction" to confer authority on a federal agency confirm that the term is not one of express preemption.  *E.g.*, 30 U.S.C. § 1254(a) (providing that the Secretary of the Interior has "exclusive jurisdiction" over surface coal mining when he or she adopts a federal plan for a State); *id.* § 1254(g) (separately providing that the federal plan "shall preempt[] and supersede[]" state regulations and clarifying that preemption is limited to "insofar as

---

[13] The other held that an eligibility determination of the United States Olympic Committee for an athlete during the Olympic trials fell within the Committee's exclusive jurisdiction. *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 596 (7th Cir. 2001).  This was not particularly groundbreaking or relevant to sports *betting*.

27

they interfere with" accomplishing the goals of the statute and indicating that the Secretary must clearly "set forth any State law or regulation" that is preempted).

Second, Robinhood also cites (PageID.74, n.10) Section 2(a)(1)(A)'s savings clause, which provides that "[e]xcept as hereinabove provided" (in the "exclusive jurisdiction" provision), "nothing contained in this section shall [] supersede or limit" the "jurisdiction conferred" on "regulatory authorities under the laws" of "any State." 7 U.S.C. § 2(a)(1)(A).  Robinhood claims this shows preemptive effect, but the clause equally suggests the opposite.  "A savings clause generally 'negates the inference that Congress left no room for state causes of action.' "  *Martin*, 793 F. Supp. 3d at 682 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)).  And even if the savings clause suggests some preemption, it does not support the view that Section 2(a)(1)(A) expressly preempts state *gaming* law.

In addition, Robinhood neglects to acknowledge that the exclusive jurisdiction language is immediately followed by the limitation "except to the extent otherwise provided in [Dodd-Frank]".  7 U.S.C. § 2(a)(1)(A).  Both the Special Rule contained in statutory text of Dodd-Frank and the CFTC's enacting regulation 40.11 provide an express carve-out from the CFTC's regulation of **any** contract on a DCM if those contracts relate to "gaming" or activities that are "unlawful under any State . . . law." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I); 17 C.F.R. § 40.11(a).  This expressed deference to state law, adopted pursuant to one of the exceptions to CFTC jurisdiction which 7 U.S.C. § 2(a)(1)(A) provides, directly evidences Congress' intent to "avoid[] unintended encroachment on the authority of the States" as it pertains to event

28

contracts. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993); *see also, e.g.,* *Schuler*, 2026 WL 657004 at *8 (noting that the express reference to the "laws . . . of any State" in 7 U.S.C. § 2(a)(1)(A) "leaves ample room for states to legislate and regulate").

### 3.    Field preemption does not apply.

"The presumption against preemption operates with special force in cases in which Congress has legislated in a field which the States have traditionally occupied." *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (cleaned up).  "States, of course, have traditionally regulated intrastate gambling activity like [sports betting]." *Churchill Downs,* 162 F.4th at 635.  Crucially, it "accounts for the historic presence of state law" but "the existence of federal regulations does not undermine the presumption against preemption." *Fenner*, 113 F.4th at 594.

Here, nothing shows that Congress intended to preempt state *gaming* law in particular. *Martin*, 793 F. Supp. 3d at 680; *see Massachusetts v. KalshiEX LLC*, 2026 WL 188019 at *5-7 (Mass. Super. Ct. Suffolk Cnty. Jan. 20, 2026).  The CEA does not expressly refer to gaming, except in limited circumstances that do not help Robinhood.  *See* 7 U.S.C. §§ 7a-2(c)(5), 16(e)(2).  The CEA also does not contain a comprehensive regulatory scheme for gaming.  It lacks the most basic features of such a scheme.  The CEA does not require licensing or background checks, indicate what bets are allowed, contain protections against insider betting or unfair bets, or provide for basic consumer protections (such as age restrictions or measures to address problem gaming).

29

Robinhood argues, without elaboration, (PageID.79-80) that the CEA contains a comprehensive scheme for regulating "designated and registered entitities" that field preempts state gaming law.  But the decision cited addresses *bona fide* commodity derivatives; not sports wagers *guised* as commodity derivatives.  Further, the decisions that "carefully focused on the scope of Congress's preemptive intent" recognized "that intent had limits."  *Martin*, 793 F. Supp. 3d at 682; *see, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (the CEA preempts only state laws that "directly affect trading on or the operation of a futures market"—which Michigan's licensing requirements do not).  The cited materials simply do not show that Congress intended to preempt the field of gaming.  *Martin*, 793 F. Supp. 3d at 684 n.5; *Mass.*, 2026 WL 188019, at *6-7.

Robinhood cites (PageID.80) *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986), but that case actually held that the statutory provision at issue "constitutes a congressional denial of power to the FCC to require state commissions to follow FCC depreciation practices for intrastate ratemaking purposes, and the FCC may not take 'pre-emptive' action merely because it thinks such action will best effectuate federal policy."  *Id*. at 356.  Similarly, the CEA does not allow the CFTC to preempt the state's intrastate regulation of sports betting.

Robinhood cites (PageID.80) *Arizona v. United States*, 567 U.S. 387 (2012), but that case is completely different.  There, Arizona sought to penalize violations of federal immigration law, and the Supreme Court invalidated that scheme because it would interfere with the discretion Congress gave to the Executive Branch to enforce

30

federal law.  *Id.* at 403, 406.  In contrast, the CEA expressly stated in the text of the Act its intent to allow state law room to operate.  *See supra* at 26-27; 32.

Commodity-futures regulation and gaming regulation are different fields with different regulatory needs and policy goals.  *See* 89 Fed. Reg. at 48982-83.  Commodity-futures markets serve an important function in our Nation's economy— they allow commercial sellers and buyers of commodities to manage financial risk by trading with investors.  *See* 7 U.S.C. § 5(a).  Although some previously characterized commodity-futures trading as akin to gambling, this trading is permitted so that commodity-futures markets may efficiently function.  *See Merrill Lynch*, 456 U.S. at 358-59.  The CFTC regulates trading to curb excess speculation and ensure that prices reflect economic reality.  *See* 7 U.S.C. § 6(a).

In contrast, sports betting is a form of entertainment.  The millions of people who gamble on sports do not seek to hedge existing financial risks; they create the risk by betting.  Gaming is regulated as a form of entertainment to ensure that it is fair and free of criminal elements, and to protect the public (especially young people and problem gamers).  *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185.  The CEA simply does not contemplate that type of regulation.

### 4.    Conflict preemption does not apply.

"A state law is 'conflict' preempted only *to the extent it actually conflicts* with federal law, that is, when it is *impossible*[14] to comply with both state and federal law,

---

[14] Robinhood does not argue impossibility.

31

or where the state law stands as an *obstacle* to the accomplishment of the full purposes and objectives of Congress." *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (cleaned up, emphasis added).

There is a "high threshold" to prove that "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress" such that obstacle preemption applies. *Fenner*, 113 F.4th at 594. There is no evidence of a congressional purpose to allow sports gambling on DCMs. *See supra* at 22-24. And even if Congress intended to allow sports betting on DCMs, Robinhood could obtain a Michigan license (as other sportsbooks have) and offer its wagers.

Robinhood argues (PageID.80) that requiring it to comply with Michigan gaming law would frustrate the CEA's goal of uniform regulation of derivatives markets. But uniformity is a field-preemption argument, not a conflict-preemption argument. *See Fednav, Ltd. v. Chester*, 505 F. Supp. 2d 381, 397 (E.D. Mich. 2007), aff'd, 547 F.3d 607 (6th Cir. 2008). Conflict preemption assumes that States may regulate and may regulate nonuniformly. *See Wyeth v. Levine*, 555 U.S. 555, 575 (2009).

### 5. Robinhood's view would require impliedly repealing other federal laws.

Robinhood's view of the CEA would require finding that Congress impliedly repealed other federal laws, including the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, and the Wire Act, 18 U.S.C. § 1084. *Martin*, 793 F. Supp. 3d

at 683.  There is a strong presumption against repeals by implication.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

The IGRA gives Tribes the "exclusive right" to determine whether and to what extent to allow gaming that is permitted under federal and state law on tribal land, 25 U.S.C. § 2701(5), and it contains a comprehensive scheme to regulate that gaming, *see id.* § 2710.  Robinhood's view would completely override the Tribes' authority and disrupt that scheme, because under Robinhood's view, Congress gave the CFTC the exclusive authority to determine how much sports betting to allow nationwide, including on tribal land.  *Martin*, 793 F. Supp. 3d at 683.

The Wire Act makes it a federal crime to use interstate wire communication facilities, including the internet, to place bets or wagers on "any sporting event," except where such wagers are legal in both the sending and receiving State.  18 U.S.C. § 1084(a).  Yet under Robinhood's view, customers could engage in sports betting wherever they are, with no regard for state law—thus nullifying the Wire Act. *Martin*, 793 F. Supp. 3d at 683.

The IGRA and Wire Act confirm both that Congress knows how to regulate gambling, and that it generally has deferred to state judgments in doing so.

### C.    The new CFTC Chair's speeches and briefs switching positions are not entitled to deference.

"[A]gencies have no special competence in resolving statutory ambiguities," especially when it comes to "the scope of an agency's own power"—that is the circumstance in which following the agency's views is "*least* appropriate."  *Loper*

33

*Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024). The new CFTC commentary does not constitute formal CFTC guidance or final CFTC rules, and, even if it did, it would not constrain this Court to adopt the CFTC's views. Additionally, the consistent views of the 40 states, D.C., gaming regulators, and tribes that are in public agreement are more persuasive. *See* States (Exhibit 1), Gaming Regulators (Exhibit 2), and Tribes (Exhibit 3) Amicus Briefs, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026).

First, the CFTC's brief failed to mention its own on-point regulation, 17 C.F.R. § 40.11. That regulation categorically prohibits "gaming" on CFTC-regulated DCMs. *See also* Grant Mitchell, *Former CFTC Chair Talks Prediction Markets: 'Betting On Sports is Gaming'*, Covers (Apr 15, 2026) https://tinyurl.com/3ke87ke2.

Second, before *Loper Bright*, deference was only warranted when the agency's "interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright*, 603 U.S. at 386. The CFTC has never regulated sports betting. The CFTC's new assertion that sports bets are swaps is an abrupt change in position, with no explanation.

As recently as 2024, the CFTC explained that commodity derivatives trading and gambling are different, and the CEA and its regulations "are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." 89 Fed. Reg. at 48983. The CFTC

34

concluded that it has neither "the statutory mandate nor specialized experience appropriate to oversee" gaming. *Id.*

The CFTC's failure to explain this about-face should be viewed with skepticism. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (when the agency changes its interpretation without acknowledgment or explanation, it is "arbitrary and capricious").

## II.    Robinhood failed to establish irreparable harm.

"To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Schs.,* 942 F.3d 324, 327 (6th Cir. 2019) (cleaned up).    "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 27 (emphasis in original).  Plaintiff cannot demonstrate irreparable harm because it failed to demonstrate the imminence or certainty of its alleged harms.

Robinhood asserts (PageID.83-84) that it would be harmed if Michigan filed a state enforcement action against it based entirely on a lawsuit in which the Michigan Attorney General sued a DCM, Kalshi, for "unlicensed gambling."   But a state enforcement proceeding "typically does not constitute irreparable harm," because Robinhood could raise any potential defense. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017).

The fact that "[D]efendants have made no attempt to prosecute" Plaintiff in any forum yet is enough to establish that "no irreparable harm has been shown in

this case." *McNeilus Truck and Mfg., Inc. v. State of Ohio*, 142 F.3d 435 (6th Cir. 1998). As this Court put it when denying Polymarket's request for a temporary restraining order last month, "[w]hile Plaintiff has demonstrated that [Michigan] state officials have begun articulating their legal position by suing KalshiEX, it is not yet clear that the prospect of a state suit is imminent for Plaintiff." *Order Denying TRO*, No. 1:26-cv-00710, PageID.233 (cleaned up).

Robinhood has not demonstrated a likely loss of competitive position and goodwill that satisfies the injury prong. Robinhood offers a suite of products, with sports-events contracts only making up a portion of its business. (PageID.91, ¶ 3.) There is no evidence that Michigan users will quit Robinhood all together, or think any differently about Robinhood's products if it obtains a license to run its sportsbook. Robinhood could comply with both Michigan law and the CEA if it wanted to, it simply needs to get licensed. All licensed sports betting operators in Michigan bear everyday business costs already, including costs associated with geolocating their users. Indeed, Crypto.com, Robinhood/Kalshi's competitor, has reportedly begun restricting access in other states after its loss in Nevada. *See* Tom Nightingale, *Crypto.com Pulls Sports Contracts in Several States amid Pushback*, SBC AMERICAS (Dec. 16, 2025), https://tinyurl.com/5ba6hp9v. Any such cost-of-doing-business "harm" is not irreparable.

Similarly, Robinhood's allegations (PageID.84) of reputational harm miss the mark. Robinhood/Kalshi are engaged in litigation across the country and has already been denied preliminary injunctions in *Hendrick, Martin*, and *Schuler*. The world is

36

on notice of the dubious legality of Kalshi's sports-event contracts.  In short, any reputational harm has already occurred, and preliminary relief will not change that. *See Mirion Techs. (Canberra), Inc. v. Sunpower, Inc.*, No. 2:17-CV-669, 2017 WL 5090436, at \*12 (S.D. Ohio Nov. 6, 2017); *Louisiana-Pac. Corp. v. James Hardie Bldg. Prods. Inc.*, No. 3:18-CV-00447-JPM, 2018 WL 7272047, at \*11 (M.D. Tenn. Dec. 20, 2018).

### III.    The balance of equities and the public interest favor the State Defendants.

Similar to its cohort, Polymarket, Plaintiff's argument addressing the last two factors of the preliminary injunction analysis—an evaluation of the public interest and a balancing of the equities—"falls apart if the state laws are not in violation of the Supremacy Clause, so Plaintiff's public interest arguments are only as persuasive as its arguments on the likelihood of success on the merits." *Order Denying TRO*, No. 1:26-cv-00710, PageID.234.  As discussed above, Plaintiff's merits arguments are not persuasive.  *See supra* at 8-20.

In addition, "he who comes into equity must come with clean hands." *Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Pub. Co.*, 839 F.2d 1147, 1155 (6th Cir. 1988).  Robinhood/Kalshi have not done so.  Kalshi has self-certified that its sports bets, are compliant with the CEA and its regulations, even though contracts involving, relating to, or referencing "gaming" or activities unlawful under state law are explicitly prohibited by 17 C.F.R. § 40.11(a).  *See supra* at 1, 7, 14.  This Court

37

should deny Robinhood the relief it seeks because it has approached the Court with unclean hands. *Cleveland Newspaper Guild,* 839 F.2d at 1155.

**Enforcement of state law.**

The "enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare." *Washington*, 879 F.2d at 1401; *cf.* 89 Fed. Reg. 48968, 48981 (June 10, 2024) ("[t]he [CFTC] . . . believes that permitting trading, on CFTC-regulated markets, in contracts that involve activity that is unlawful under state law . . . would undermine important state interests, expressed in state statutes and common law, in protecting the public good."). The State Defendants are statutorily charged with enforcing Michigan's gaming laws. Preventing them from doing so poses an affront to Michigan's sovereignty and intrudes on the democratic will of the people.

**Harm to the integrity of gaming.**

Michigan law permits wagers only when there are sufficient safeguards to ensure that wagering is fair. For example, Michigan prohibits the acceptance of wagers on any events or the offering of any wager types that are illegal under state or federal law, inherently objectionable, or inconsistent with the public policy of Michigan (e.g., events played by individuals at the high school level or below). Mich. Comp. Laws § 432.410(3) & (4); Mich. Admin. Code R 432.745. All events must be

subject to effective supervision and integrity safeguards, and a sports governing body may object to wagers on its events in case of an integrity concern.[15]  *Id.*

Robinhood claims that CFTC regulations protect against market manipulation.  But the CFTC is not a gaming regulator, and as Robinhood indicated (PageID.68), the CFTC generally leaves DCMs to self-regulate.  The CEO of Coinbase exposed these vulnerabilities when, at the end of a recent earnings call, he deliberately spoke five seemingly random words specifically to change the result of a Kalshi event contract on what he would say during the call.  Emily Nicolle & Justina Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025), perma.cc/9S4K-Q2K8.  Michigan law does not allow wagers on these types of unregulated "events" precisely because of the risk of manipulation and threat to public confidence.

**Harm to the public.**

Allowing Robinhood/Kalshi to continue operating would harm some of Michigan's most vulnerable residents.  Michigan law prohibits people under 21 from gaming, Mich. Comp. Laws § 432.411; Robinhood, by contrast, allows anyone over 18 to bet on its platform.  Robinhood, *Customer Agreement* (Apr. 10, 2026),

---

[15] Robinhood offers sports betting without those safeguards—for which it and its competitors have drawn criticism from sports leagues.  See Kendall Baker, *NCAA President Charlie Baker on Sports Betting*, Yahoo! Sports (Dec. 11, 2025), perma.cc/DDS6-XDDF; *CFTC Reauthorization: Stakeholder Perspectives Before the H. Comm. on Agric.*, 119th Cong. (2025) (statement of Jeff Miller, NFL), perma.cc/Z5X3-L9WR.

https://cdn.robinhood.com/assets/robinhood/legal/Robinhood-Customer-Agreement.pdf.

Michigan operates a statewide self-exclusion program, and each licensed sports betting operator is required to offer various responsible gaming tools. At a minimum, such tools must include temporary and permanent self-exclusion, self-imposed responsible gaming limits (e.g., periodic deposit and wagering limits), and temporary account suspension.[16] "[N]either DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators and licensed entities are." *Hendrick*, 2025 WL 3286282 at *13

**Harm to Michigan's gaming industry.**

Robinhood/Kalshi's failure to comply with Michigan gaming law gives it a massive and unfair advantage over its competitors, which greatly disrupts the industry. That advantage is both pecuniary, in that Robinhood does not need to spend the money that its law-abiding competitors need to spend on licensing fees, taxes, and compliance, as well as strategic, in that Kalshi's products are not subject to the same strict requirements as its licensed competitors. The State of Michigan suffers irreparable harm when Robinhood is able to distort the playing field and disrupt the industry in this manner. *Hendrick*, 2025 WL 3286282, at * 13-14; see *Hotel Emps & Rest Emps Int'l Union v Nev Gaming Comm'n*, 984 F.2d 1507, 1509 (9th Cir 1993).

---

[16] Mich. Comp. Laws § 432.412; Mich. Admin. Code R 432.752, R 432.753, R 432.754, R 432.759, R 432.772, & R 432.774.

"Prediction markets generated nearly $64 billion in trading volume last year, compared to under $16 billion the year prior." Ryan Butler, *Prediction Market Volume Quadrupled in Past 2 Years, Report Finds*, Yahoo! Finance (Mar. 13, 2026) https://tinyurl.com/447ftvtt. Reports indicate that "[m]ore than 80% of that volume has been driven by event contracts on sporting events." *Id*. In contrast, adjusted gross receipts on Michigan's regulated internet sports betting dropped by 32.5% year-over-year and 39.5% month-over-month. *Press Release*, Michigan Gaming Control Board (Feb 19, 2026) https://tinyurl.com/muu3k7ha (hereinafter, *MGCB Press Release*).

Put simply, the so-called prediction markets have massively expanded their unlicensed gambling business, to the detriment of state-licensed competitors.

**Financial harm to the State, the City of Detroit, and the Tribes.**

Internet sports betting revenue to the State is primarily allocated to the Compulsive Gambling Prevention Fund, the Michigan Strategic Fund, the First Responder Presumed Coverage Fund, and the School Aid Fund. Mich. Comp. Laws §§ 432.415a, 432.416. As noted above, unlicensed sportsbooks undercutting the regulated market has already resulted in ever-decreasing adjusted gross receipts for law-abiding licensees, resulting in decreased tax revenue. Tax revenue from gaming has been a critical pillar in the City of Detroit's finances as the City has recovered from bankruptcy, emerging as its second-largest revenue source. *Detroit leans on online gaming, sports betting to fund city services*, Yogonet (Feb 9, 2026) https://tinyurl.com/ycxhdfjh.

41

Michigan is also home to twelve federally recognized Indian Tribes, which are both sovereigns and gaming regulators in their own right. The State does not presume to speak for the Tribes, but many State citizens are also Tribal citizens. Robinhood/Kalshi's unregulated conduct denies Tribes the revenue from regulated gaming that they depend on to operate their governments.

Robinhood merely asserts that because it is correct on the merits, none of the public's harms matter. But it is wrong on the merits. And if the merits were debatable, Robinhood has not shown that the balance of harms tips sharply in its favor.

## CONCLUSION AND RELIEF REQUESTED

For the above reasons, the Court should deny Plaintiff's Motion in its entirety.

Respectfully submitted,

<u>Lauren E. Fitzsimons</u>
Lauren E. Fitzsimons (P82997)
Felepe H. Hall (P59533)
Assistant Attorneys General
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI 48823
Tel:  (517) 241-0210
FitzsimonsL@michigan.gov
HallF2@michigan.gov

David S. Slovick
Special Assistant Attorney General
Kopecky Schumacher Rosenburg LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
dslovick@ksrlaw.com

*Attorneys for Defendants*

Dated:  April 21, 2026

43

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the word count limitation of W.D. Mich. L. Civ. R. 7.2 because, excluding the part of the document exempted by W.D. Mich. L. Civ. R. 7.2, this brief contains no more than 10,800 words.  This document contains 10,630 words.

2.    This word count was generated using Microsoft Word for Microsoft 365 MSO, version 2410.

Respectfully submitted,

/s/ Lauren Fitzsimons
Lauren E. Fitzsimons (P82997)
Assistant Attorney General
Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI 48823
Tel:  (517) 241-0210
FitzsimonsL@michigan.gov

Dated:  April 21, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2026, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/ Lauren Fitzsimons
Lauren E. Fitzsimons (P82997)
Assistant Attorney General
Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway, 2nd Floor
East Lansing, MI 48823
Tel:  (517) 241-0210
FitzsimonsL@michigan.gov

45