**Nos. 25-7187, 25-7516, and 25-7831 (Consolidated)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D/B/A CRYPTO.COM | DERIVATIVES NORTH AMERICA,
*Plaintiff-Appellant*,

v.

THE STATE OF NEVADA, ET AL.,
*Defendants-Appellees*,

and

NEVADA RESORT ASSOCIATION,
*Intervenor Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Nevada
No. 2:25-cv-00978-APG

**BRIEF OF THE INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, ARIZONA INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 19 FEDERALLY RECOGNIZED INDIAN TRIBES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES IN NO. 25-7187**

Joseph H. Webster
Elizabeth A. Bower
Jens W. Camp
Alexandra K. Holden
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com
aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Bryan Newland
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
(202) 349-4265
Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian
Community, Mohegan Tribe of
Indians of Connecticut, Rincon Band
of Luiseño Indians, and Santa Ynez
Band of Chumash Mission Indians*

Scott Crowell
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño
Indians, Santa Ynez Band of Chumash
Mission Indians, and Spokane Tribe
of the Spokane Reservation*

Michael Hoenig
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
(909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San
Manuel Nation and San Manuel
Gaming and Hospitality Authority*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

IDENTITY AND INTERESTS OF AMICI ...................................................... 1

INTRODUCTION ....................................................................................... 3

ARGUMENT .............................................................................................. 6

    I.    Congress Did Not Impliedly Repeal IGRA ........................................... 6

        A.   IGRA's Structure ...................................................................... 6

        B.   Congress Did Not Repeal IGRA When It Enacted the CEA's Definition of a "Swap" in 2010. ................................................ 7

        C.   Crypto.com's Theory Does Not Meet the Standard for Implied Repeals. 11

            1.   Crypto.com's sports-betting contracts are not "swaps." ..................... 12

            2.  Congress did not manifest clear intent to repeal IGRA or to make the CFTC a gaming regulator. ................................................... 15

            3.  The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes. ............................................ 19

        D. IGRA Regulates Online Gaming on Tribes' Indian Lands-Including Crypto.com's Sports-Betting Contracts. ....................................... 20

    II.   The Major Questions Doctrine Forecloses Crypto.com's Theory. .......... 22

    III.Crypto.com's Preemption Argument Would Violate the Private Nondelegation Doctrine. ................................................................. 27

CONCLUSION ....................................................................................... 29

i

# TABLE OF AUTHORITIES

**Cases**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024)........................................................................28

*Artichoke Joe's California Grand Casino v. Norton*,
  353 F.3d 712 (9th Cir. 2003) ....................................................................... 19, 23

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987)..................................................................................5, 24

*California v. Iipay Nation of Santa Ysabel*,
  898 F.3d 960 (9th Cir. 2018) ..........................................................................21

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936).................................................................................. 27, 29

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
  42 F.4th 1024 (9th Cir. 2022) .........................................................................7, 24

*Crypto.com v. Dreitzer*,
  No. 2:25-cv-00978 (D. Nev. Sep. 29, 2025)........................................... 7, 20, 21

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018)....................................................................................12

*FCC v. Consumers' Rsch.*,
  606 U.S. 656 (2025)................................................................................ 27, 28

*FDA v. Brown & Williamson*,
  529 U.S. 120 (2000)....................................................................................25

*Helton v. Hunt*,
  330 F.3d 242 (4th Cir. 2003) ..........................................................................24

*KalshiEX LLC v. CFTC*,
  No. 24-5205 (D.C. Cir. Nov. 15, 2024)..........................................................16

*KalshiEX, LLC v. Hendrick*,
    No. 2:25-cv-00575 (D. Nev. Nov. 24, 2025)........................................... 13, 14, 27

*KalshiEX, LLC v. Schuler*,
    No. 2:25-cv-1165 (Mar. 9, 2026).........................................................................9

*Learning Res. v. Trump*,
    No. 24-1287, 2026 WL 477534 (U.S. Feb. 20, 2026)........................................23

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)...........................................................................................19

*MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*,
    512 U.S. 218 (1994)...........................................................................................23

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014).............................................................................................4

*Montana v. Blackfeet Tribe of Indians*,
    471 U.S. 759 (1985)...........................................................................................19

*Morton v. Mancari*,
    417 U.S. 535 (1974)..................................................................................... 20, 24

*Murphy v. NCAA*,
    584 U.S. 453 (2018)...........................................................................................23

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*,
    153 F.4th 748 (9th Cir. 2025) ...................................................................... 12, 20

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)...........................................................................................23

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
    951 F.3d 1142 (9th Cir. 2020) ...........................................................................20

*United States v. Metcalf*,
    156 F.4th 871 (9th Cir. 2025) ............................................................................29

*W. Flagler Assocs., Ltd. v. Haaland*,
    71 F.4th 1059 (D.C. Cir. 2023) ........................................................................ 20, 24

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ........................................................................................... 22, 23

**Statutes**

17 C.F.R. § 40.11(a)(1) ............................................................................... 15, 17, 18

18 U.S.C. § 1084 ........................................................................................................22

18 U.S.C. § 1166(d) ..................................................................................................10

18 U.S.C. § 1952(a) ..................................................................................................22

18 U.S.C. § 1955 .......................................................................................................22

25 C.F.R. § 293.26 ....................................................................................................20

25 C.F.R. § 502.3(c) ....................................................................................................8

25 C.F.R. § 502.4(c) ................................................................................................6, 8

25 U.S.C. § 2701(5) ................................................................................... 5, 8, 10, 24

25 U.S.C. § 2702 .........................................................................................................6

25 U.S.C. § 2702(1) ....................................................................................................4

25 U.S.C. § 2702(2) .................................................................................................5, 24

25 U.S.C. § 2703(5) ....................................................................................................3

25 U.S.C. § 2710(b)(2)(A) .........................................................................................7

25 U.S.C. § 2710(d) ...............................................................................................6, 10

25 U.S.C. § 2710(d)(1) ...............................................................................................6

25 U.S.C. § 2710(d)(2)(A) .........................................................................................7

25 U.S.C. § 2710(d)(7)(B)(vii) ..................................................................................6

25 U.S.C. § 2710(d)(8)..................................................................................6

31 U.S.C. § 5361(b) ...................................................................................21

31 U.S.C. § 5362 ........................................................................................21

7 U.S.C. § 16(e) .........................................................................................25

7 U.S.C. § 1a(47)(A)(ii) .............................................................................12

7 U.S.C. § 1a(9) .........................................................................................14

7 U.S.C. § 2(e) .............................................................................................8

7 U.S.C. § 5(a)–(b)...................................................................................7, 26

7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii)..................................................................15

NRS § 464.005(8) .........................................................................................8

## Other Authorities

156 Cong. Rec. S5907 (daily ed. Jul. 15, 2010) ............................... 11, 15

Commodity Options, 77 Fed. Reg. 25320 (Apr. 27, 2012) ...................14

Event Contracts; Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5386 (Feb. 6, 2026)....................................................................................18

Event Contracts, 89 Fed. Reg. 48968 (June 10, 2024) ..........................17

Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sep. 3, 2025)......28

Jessica Welman, *Kalshi's lawyer goes hard at state-regulated gambling*, SBCAmericas, (Jul. 11, 2025) ............................................................10

Michael S. Selig, Chairman, CFTC, *Remarks at the CFTC-SEC Event on Harmonization* (Jan. 29, 2026) .......................................................18

National Indian Gaming Commission, FY 2023 Gross Gaming Revenue Report (Jul. 2024) ..........................................................................................4

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (Jul. 27, 2011)...16

*Sports Event Trading*, Crypto.com, (last visited Mar. 9, 2026) ..............................13

## IDENTITY AND INTERESTS OF AMICI

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Arizona Indian Gaming Association ("AIGA"), California Nations Indian Gaming Association ("CNIGA"), Oklahoma Indian Gaming Association ("OIGA"), Washington Indian Gaming Association ("WIGA"), San Manuel Gaming and Hospitality Authority ("SMGHA"), and 19 federally recognized Indian tribes ("Amici Tribes")[1] (collectively, "Tribal Amici") respectfully submit this brief in support of Defendants-Appellees.[2]

IGA is an inter-tribal non-profit organization comprised of 123 federally recognized tribes that operate gaming enterprises throughout Indian Country. IGA's mission is to advance tribal economic, social, and political interests, and to

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Jamestown S'Klallam Tribe; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuhaaviatam of San Manuel Nation.

[2] Counsel for each of the parties have consented to the filing of this brief. No person (including a party or party's counsel) other than Tribal Amici and their counsel contributed money to fund the preparation and submission of this brief.

preserve and promote tribal sovereignty, self-sufficiency, and economic development by advocating for tribally owned governmental gaming enterprises.

NCAI is the oldest and largest national organization comprised of American Indian and Alaska Native tribal governments and their citizens.  NCAI advises and educates the public, tribes, state governments, and the federal government on issues involving tribal sovereignty, self-government, treaty rights, and policies affecting tribes, including gaming issues.

USET SPF is a non-profit, inter-tribal organization advocating on behalf of 33 federally recognized tribes.  It is dedicated to promoting, protecting, and advancing the inherent sovereign rights and authorities of tribes and works at the regional and national level to educate federal, state, and local governments about the unique historic and political status of its member tribes.

AIGA, CNIGA, OIGA, and WIGA are regional non-profit tribal gaming organizations that educate and disseminate information to federal and state governments as well as the general public concerning issues related to Indian gaming.

SMGHA is a governmental instrumentality of Yuhaaviatam of San Manuel Nation created to independently carry out the investment in, and ownership and management of, gaming and hospitality businesses outside of the Yuhaaviatam Reservation.

The Amici Tribes are 19 federally recognized Indian Tribes within the meaning of the Indian Gaming Regulatory Act ("IGRA"). *See* 25 U.S.C. § 2703(5). Each of the Amici Tribes is a separate and distinct tribal government with the sovereign authority to conduct and regulate gaming activities on its Indian lands. The Amici Tribes all have a direct and immediate interest in maintaining their sovereign rights over gaming, including sports betting, on their Indian lands.

Together, all the Tribal Amici have a shared, strong interest in this case because of its potential to significantly impact their or their member tribes' sovereign rights regarding gaming on Indian lands, as well as Indian gaming and tribal governmental revenue as a whole.

## INTRODUCTION

North American Derivatives Exchange Inc. d/b/a Crypto.com | Derivatives North America ("Crypto.com") comes before this Court and asks it to wholly abandon the national policy of state and tribal sports-betting regulation and to turn decades of federal law on its head. The Court should not do so and, instead, affirm the district court's decision.

America's history is replete with prospectors taking resources from Indian lands without permission from tribes. But Congress put a stop to that practice long ago. Yet Crypto.com would have this Court believe that, without so much as a whisper of legislative intent, Congress gave it permission to enter Indian lands and

3

siphon gaming revenues away from tribes over such tribes' objections.  Congress

did no such thing.

When Congress adopted IGRA, it sought to "promot[e] tribal economic

development, self-sufficiency, and strong tribal governments."  25 U.S.C.

§ 2702(1).  IGRA has been incredibly successful on that front.[3]  Since IGRA's

passage in 1988, tribes across the United States have lifted entire generations out

of poverty through tribal gaming.  Gaming revenue supports thousands of jobs in

hundreds of communities, and provides critical funding to tribal, state, and local

governments through revenue-sharing agreements, taxes, and economic stimulus.

*See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 810 (2014) (Sotomayor, J.,

concurring) ("[T]ribal gaming operations cannot be understood as mere profit-

making ventures that are wholly separate from the Tribes' core governmental

functions.").  For tribes, gaming is not just a commercial endeavor but an

existential one.

Tribes have primary jurisdiction over their lands and activities occurring thereon.

Tribes, like states, also have a strong sovereign interest in determining

---

[3] *See, e.g.*, National Indian Gaming Commission, FY 2023 Gross Gaming Revenue Report 4–5 (Jul. 2024), https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

what gaming activities may take place on their lands.  Thus, tribal jurisdiction extends to gaming, which has long been recognized by the Supreme Court.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–22 (1987); 25 U.S.C. § 2701(5).  In 1988, Congress enacted IGRA "to provide a statutory basis for the regulation of gaming by an Indian tribe … to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operators and players…."  25 U.S.C. § 2702(2).

Crypto.com asks this Court to subvert this longstanding and comprehensive regulatory regime.  The consequences of Crypto.com's arguments are difficult to overstate.  Its reading of the Commodity Exchange Act ("CEA") would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent; undermine existing tribal-state gaming compacts and regulatory frameworks; allow Crypto.com to siphon gaming revenues from tribal and state governments; and diminish tribal self-determination.

Accordingly, this Court should affirm the district court's decision to deny Crypto.com's motion for judgment on the pleadings and motion for preliminary injunction.

## ARGUMENT

**I.    Congress Did Not Impliedly Repeal IGRA.**

**A.    IGRA's Structure**

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribe and is in a state that permits such gaming.  25 U.S.C. § 2710(d).  Class III gaming—including sports betting—is authorized on Indian lands only where tribes and states have entered into a compact or procedures prescribed by the Secretary of the Interior ("Secretary") to regulate that gaming.  25 U.S.C. §§ 2710(d)(1), 2710(d)(7)(B)(vii); *see also* 25 C.F.R. § 502.4(c).  The Secretary must review and approve these agreements.  25 U.S.C. § 2710(d)(8).  These core provisions have remained unchanged since 1988.

Under this regime, regulation of class III gaming on Indian lands is shared between tribes, states, and the federal government.  Congress carefully crafted this comprehensive statutory regime to advance clearly articulated policy goals to: (1) "promot[e] tribal economic development, self-sufficiency, and strong tribal governments"; (2) "provide a statutory basis for regulation" that protects tribes' ability to be the primary beneficiary of gaming on their lands; and (3) create a federal regulatory agency to adopt federal standards and protect tribal gaming as a means of generating tribal revenue.  25 U.S.C. § 2702.  Congress made it abundantly clear that tribes—not private entities—must benefit from any gaming

6

conducted on their Indian lands.  *See* 25 U.S.C. §§ 2710(b)(2)(A), (d)(2)(A).  For many tribes, gaming is not merely a commercial endeavor; rather, it is essential to their self-determination.  *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022) ("Class III gaming is not only a source of substantial revenue for tribes, but *the lifeblood on which many tribes ha[ve] come to rely*." (citation modified)).

**B.      Congress Did Not Repeal IGRA When It Enacted the CEA's Definition of a "Swap" in 2010.**

Crypto.com argues that Congress's definition of a single term—"swaps"—within a statute whose entire purpose is to address the risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), preempts the field of what is unequivocally sports betting, and therefore effectively repealed core provisions of IGRA.  *See* Pl.'s Opening Brief at 4–5, 39–54, Dkt. No. 12.1.  Under this theory, Congress silently stripped away tribes' and states' longstanding authority over sports betting[4] while allowing for-profit companies like Crypto.com to run internet casinos pursuant to their own private oversight.

---

[4] Crypto.com has suggested that that its sports-event contracts are not gaming because there is no betting against the "house."  Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. at 6, *Crypto.com v. Dreitzer*, No. 2:25-cv-00978 (D. Nev. Jul. 29, 2025), Dkt. No. 41.  Not so.  A "house" is not a necessary element of gaming.  For example, pari-mutuel wagering—a type of betting system where all bets or wagers

What's more, contrary to what Crypto.com maintains, *id.* at 60–62, if sports-betting contracts are "swaps" subject to the exclusive jurisdiction of the CFTC, then all off-market sports betting—including sports betting conducted by tribes under IGRA—is prohibited by the CEA.  As discussed further below, Crypto.com's interpretation of "swaps" is so broad that it necessarily consumes all sports betting (and potentially other kinds of class III gaming).  And with one inapplicable exception, the CEA prohibits off-market swaps.  *See* 7 U.S.C. § 2(e).  Consequently, if all sports-betting contracts are swaps, "then all sports betting must be done on a [designated contract market ('DCM')]."  ER-27.

Crypto.com's argument thus does double violence.  First, by permitting Crypto.com to offer sports betting on Indian lands, its argument sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands …."  25 U.S.C. § 2701(5).  Second, it would prohibit tribes from offering sports betting that IGRA plainly authorizes.  *See* 25 C.F.R. § 502.4(c).

---

are pooled and players bet against each other rather than a "house"—is considered gaming.  *See, e.g.*, NRS § 464.005(8).  Additionally, IGRA regulations define class II gaming to include, among other things, nonbanking card games that are necessarily played without a "house."  25 C.F.R. § 502.3(c).

Moreover, if Crypto.com's position is adopted, the reach of this definition would extend beyond sports betting to encompass other forms of gaming because, as the district court correctly held, Crypto.com's preemption argument depends on an interpretation of "swap" that has "no limiting principle." *See* ER-25. Crypto.com's definition of "an event or contingency associated with a potential financial, economic, or commercial consequence" is so broad that it necessarily includes betting on other casino games. This means that virtually all gaming activity across the country, including that which would otherwise be conducted pursuant to an IGRA compact, must be offered on a DCM. The irony of this result is that the gaming conducted pursuant to tribal-state gaming compacts or state law provides significantly more consumer protection than the unregulated sports betting offered by Crypto.com, which allows users as young as 18 years old to engage in practically limitless betting with few, if any, guardrails.

This lack of responsible gaming measures and consumer protections, which are required by legal gaming operations, is dangerous and contrary to the public interest. *See* Opinion and Order at 21 n.9, *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165 (Mar. 9, 2026) (Ohio "determined [18 through 20-year-olds] were too young to participate in legal sports gambling, … but they have unrestricted access to sports-event contracts on Kalshi[]. This population is particularly vulnerable to problem gambling and [], when trading on Kalshi, is unprotected by Ohio's

responsible gaming laws." (citation modified)).  Josh Sterling—a former CFTC employee and the lawyer representing KalshiEX, LLC ("Kalshi") in this consolidated litigation—has unpersuasively dismissed such responsible gaming concerns, stating: "People are adults, and they're allowed to spend their money however they want it, and if they lose their shirt, that's on them."  Jessica Welman, *Kalshi's Lawyer Goes Hard at State-Regulated Gambling*, SBCAmericas, (Jul. 11, 2025), https://sbcamericas.com/2025/07/11/kalshi-nclgs-sports-contract-debate/?amp.

Further, if the CEA governs Crypto.com's sports-betting contracts (and potentially other forms of gaming) on Indian lands, then Congress must have intended to repeal other key provisions of IGRA that expressly grant regulatory authority over such activity to tribes, states, the National Indian Gaming Commission, the Department of the Interior, and the Department of Justice.  *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d).  Congress also must have intended to completely override the entire purpose and function of IGRA: recognizing tribal sovereignty over conducting and regulating gaming activity occurring on Indian lands.  *See* 25 U.S.C. § 2701(5).  No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA.

10

This Court should therefore reject Crypto.com's boundless interpretation of a "swap" and give effect to both statutes by excluding sports-betting contracts, including Crypto.com's, from the CEA's definition of "swap" as the district court did.  *See* ER-24–30.  Such an interpretation is also more faithful to the CEA's statutory language and legislative intent.  *See* 156 Cong. Rec. S5907 (daily ed. Jul. 15, 2010) (statement of Sen. Lincoln) ("It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.  These types of contracts would … be used solely for gambling.").

### C.    Crypto.com's Theory Does Not Meet the Standard for Implied Repeals.

Crypto.com's preemption argument must be rejected because it would manufacture an implied repeal of IGRA where none exists.  Crypto.com cannot meet the heavy burden of proving Congress intended to repeal IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend to Crypto.com's sports bets.

Both the Supreme Court and Ninth Circuit apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later

11

statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation modified);

*see also Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*,

153 F.4th 748, 759 (9th Cir. 2025). Congress's intent to repeal must be "clear and

manifest." *Epic Sys.*, 584 U.S. at 510. "Congress does not alter the fundamental

details of a regulatory scheme in vague terms or ancillary provisions—it does not,

one might say, hide elephants in mouseholes." *Id.* at 515 (citation modified).

Here, IGRA and the CEA can easily be harmonized by reading the CEA to

exclude sports betting, consistent with longstanding CFTC regulations.

> 1. *Crypto.com's sports-betting contracts are not "swaps."*

As relevant here, the CEA defines "swaps" as "any agreement, contract, or

transaction … that is dependent on the occurrence, nonoccurrence, or the extent of

the occurrence of an event or contingency associated with a potential financial,

economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Crypto.com's

sports-betting contracts simply do not fall under this definition and Congress

therefore could not have intended to repeal IGRA.

Starting with the CEA's plain language, Crypto.com's sports-betting

contracts are not dependent on the *occurrence, nonoccurrence, or extent of the*

*occurrence* of a sports event—i.e., whether the sports event occurs—but rather on

the outcome of the sports event (or parts thereof)—i.e., which team wins. The

court below correctly held sports bets are not swaps for precisely this reason.  ER-24–25.

Moreover, there is no "financial, commercial, or economic consequence"[5] associated with Crypto.com's sports-betting contracts.  Aside from whether the purchaser wins or loses their bet, Crypto.com's sports-betting contracts have no direct financial consequences for the purchaser.  To constitute a swap, the district court properly held that the underlying event itself "must be inherently associated with a potential financial consequence."  *See* Order Granting Motion to Dissolve Prelim. Inj. at 14, *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev. Nov. 24, 2025), Dkt. No. 237.  "[E]xternalities like whether people bet on the event or

---

[5] In its amicus brief, the CFTC argues that sports-betting contracts have sufficient "financial, commercial or economic consequences" because "sporting events … generate billions of dollars in economic activity and materially affect both regional and national markets."  CFTC Amicus Br. at 19, Dkt. No. 37.2.  The CFTC therefore asserts there is no need to "engage in line drawing" over what distinguishes a swap from a sports bet.  *Id.* at 19–20.  However, the CFTC fails to articulate how wagers on particular aspects of sporting events, which are typical wagering subjects appearing on Crypto.com's platform, have any quantifiable impact on the economy.  For example, the CFTC does not explain how a wager on whether the Wizards will beat the Celtics by more than 3.5 points has any downstream economic impact, let alone a sufficient "financial, commercial or economic consequence," except to that on the person placing the wager.  *See Sports Event Trading*, Crypto.com, https://help.crypto.com/en/articles/10208780-sports-event-trading (last visited Mar. 9, 2026) (explaining that users can bet on point spreads).

the contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Id.* Crypto.com's sports-betting contracts do not satisfy this requirement and therefore do not qualify as swaps.

Alternatively, the CFTC urges the Court to hold that Crypto.com's sports-betting contracts are swaps because they are "commodity options," and "the swap definition … includes options …." CFTC Amicus Br. at 16, Dkt. No. 37.2 (citing 17 C.F.R. §§ 1.3, 32.2(a); then quoting 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012)). Not so. The CFTC has recognized that commodity options are synonymous with the definition of swaps at 7 U.S.C. § 1a(47)(A)(i), which does not contain any language suggesting that commodity options include options on event outcomes. *See* 77 Fed. Reg. at 25321 n.6 (citing 7 U.S.C. § 1a(47)(A)(i)); 7 U.S.C. § 1a(47)(A)(i) (defining swap to include options on the "purchase or sale … of [] rates, currencies, commodities, securities …."); *see also* 7 U.S.C. § 1a(9) (defining "commodity" to be limited to physical goods). And even if commodity options included options on excluded commodities, Crypto.com's sports-betting contracts still would not qualify as swaps because sporting-event outcomes do not "inherently have a financial consequence" and thus are not "excluded commodities." *See Hendrick*, 2025 WL 3286282, at *11 (discussing 7 U.S.C. § 1a(19)(iv)).

        2.       *Congress did not manifest clear intent to repeal IGRA or to make the CFTC a gaming regulator.*

Congress did not repeal IGRA and grant the CFTC the exclusive authority to regulate nationwide sports betting.  In fact, Congress expressed the opposite intent and went out of its way to prevent event-contract markets from being used to conduct gambling.  *See* 156 Cong. Rec. S5906-07 (daily ed. Jul. 15, 2010) (colloquy between Sens. Feinstein and Lincoln).  Specifically, Congress enacted the "Special Rule" authorizing the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest" and to *disallow* any "gaming" activity on DCMs at all.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii).  The CFTC acted consistently with Congress's intent by promulgating its blanket prohibition of event contracts involving gaming.[6]  17 C.F.R. § 40.11(a)(1).  The CFTC explained that its "prohibition of certain 'gaming' contracts is consistent

---

[6] Crypto.com argues that even if its sports-betting contracts "resemble gaming," that is permissible because the CEA could cover some gaming-related contracts "unless and until the CFTC prohibits them."  Pl.'s Opening Br, at 61–62, Dkt. No. 12.1.  But Crypto.com contradicts itself: as Crypto.com previously (and correctly) acknowledged, "the CEA gives the CFTC discretion to prohibit the trading of swaps that 'involve … gaming,' and the CFTC exercised that jurisdiction through rulemaking that prohibits a DCM from listing such contracts."  Pl.'s Reply Br. in Supp. of Mot. for Judg. On the Pleadings and Mot. to Strike at 11, *Crypto.com v. Dreitzer*, No. 2:25-cv-00978 (D. Nev. Sep. 22, 2025), Dkt No. 87 (citing 17 C.F.R. § 40.11(a)).  Thus, in Crypto.com's own words, "[i]f Sports Event Contracts involve gaming, and are therefore regulated by [Nevada], then they cannot be traded on a DCM without violating this rule."  *Id.*

15

with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (Jul. 27, 2011) (citation modified). Thus, the CFTC recognized that the Special Rule reinforced Congress's existing policy *against* sports betting.

Kalshi, one of Crypto.com's competitors, even acknowledged this fact in a brief filed with the D.C. Circuit 16 months ago (and mere weeks before launching its nationwide sports betting app). *See* Appellee's Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) ("An event or contract thus involves 'gaming' if it is contingent on a game or game-related event. The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, ***Congress did not want sports betting to be conducted on derivatives markets***." (emphasis added)). The Special Rule and the CFTC's regulations undermine any claim that Congress intended to repeal IGRA and legalize sports betting. That the CEA and IGRA overlap here is due only to Crypto.com's backdoor attempt to evade comprehensive gaming regulations.[7]

---

[7] Under Crypto.com's theory, simply calling a sports wager a "swap"—regardless of whether it is actually a valid "swap"—and listing it for trade on a DCM automatically grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory authorities. *See* Pl.'s Opening Br. at 4–5, 39–54, Dkt. No. 12.1. What,

Furthermore, only Crypto.com (a private company with a direct financial interest in offering sports betting free from regulation), not Congress, claims that the CEA's definition of "swap" displaces tribal, state, and federal regulation of sports betting.  The text and legislative history of the 2010 CEA amendments confirm that the CFTC was not established to regulate sports betting, let alone assume the role of the nation's sole sports-betting regulator.  And, historically, the CFTC likewise did not assert such authority itself.  *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (June 10, 2024) ("The [CFTC] is not a gaming regulator … and the [CFTC] does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources in this manner.").

---

then, would prevent Crypto.com from calling "contracts" on other traditional forms of gaming, like roulette, "swaps" and subjecting them to the exclusive jurisdiction of the CFTC?  According to Crypto.com, CFTC inaction—despite banning "gaming" contracts via 17 C.F.R. § 40.11(a)(1)—is all that is required to bless contracts blatantly designed for no other purpose than to enable gambling.

Crypto.com's theory would likewise strip this Court of its own jurisdiction to interpret what constitutes a "swap."  Crypto.com argues that such determination is exclusively up to the CFTC and would only be judicially reviewable under an Administrative Procedure Act challenge.  *See id.* at 34, 62–63.  But, as the district court properly held, "the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap. … It is emphatically the province and duty of the judicial department to say what the law is."  *See* ER-19–20 (citation modified).

The CFTC's amicus brief broadly defends prediction markets' offering of sports-betting contracts subject to the CFTC's exclusive jurisdiction. *See* CFTC Amicus Br. at 19, Dkt. No. 37.2. Strikingly, the CFTC makes no mention of the Special Rule, and for good reason: as discussed, the CFTC already promulgated regulations effecting a blanket ban of gaming contracts, like those mirroring sports bets. *See* 17 C.F.R. § 40.11(a). Similarly, the CFTC fails to acknowledge that Crypto.com's preemption argument necessarily means the implied repeal of IGRA and other applicable federal laws.

Further, the CFTC's only Commissioner, Chairman Selig, has recently made statements and issued directives that some DCMs have claimed support their positions, and by extension would support Crypto.com's position here. *See* Michael S. Selig, Chairman, CFTC, *Remarks at the CFTC-SEC Event on Harmonization* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1 [hereinafter Selig Statement] (announcing that he directed the CFTC to withdraw a 2024 proposed rule, which, if finalized, would have expressly prohibited political and sports-related event contracts and a 2025 CFTC Staff Letter suggesting that entities like Crypto.com create a contingency plan should courts—like this Court—issue a decision holding that sports-betting contracts are unlawful (citing 89 Fed. Reg. at 48982–83 and CFTC Staff Letter No. 25-36 at 2 n.3, n.4 (Sep. 30, 2025)); *see also* 91 Fed. Reg. 5386, 5387 (Feb. 6, 2026).

However, his recent statements are neither binding on this Court nor persuasive, and his recent directives have no bearing on the outcome of this litigation.  At bottom, Mr. Selig's recent statements do not address key legal questions at issue in this appeal, including whether the CFTC's blanket ban on event contracts involving gaming at 17 C.F.R. § 40.11(a)(1) extends to Crypto.com's sports-betting contracts.  And even if his statements or the positions the CFTC took in its amicus brief did, the power to decide what the law says ultimately belongs to the courts, not executive officials.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024).

This Court should therefore reject Crypto.com's efforts to expand the CFTC's jurisdiction to a vast new area of regulation.

### 3.    *The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to repeal IGRA (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes.  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."); *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 729 (9th Cir. 2003).  Federal courts have consistently applied these canons over a half-century to ensure that

later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance the United States' special relationship with tribes, without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1159–60 (9th Cir. 2020); *Shoshone-Bannock Tribes*, 153 F.4th at 765.

This Court should therefore reject Crypto.com's preemption argument requiring an implied repeal of IGRA.

**D.    IGRA Regulates Online Gaming on Tribes' Indian Lands-Including Crypto.com's Sports-Betting Contracts.**

Crypto.com has tried to argue that IGRA is not relevant because its online activity does not occur on "Indian lands." *See* Pl.'s Response to Br. of Amici Curiae et al. at 2, *Crypto.com v. Dreitzer*, No. 2:25-cv-00978 (D. Nev. Sep. 29, 2025), Dkt. No. 92. However, this is plainly wrong. IGRA allows states and tribes to allocate jurisdiction over the regulation of internet gaming conducted by a tribe throughout the state, including on its Indian lands. *See W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1061–62, 1066 (D.C. Cir. 2023), *cert denied*, 144 S. Ct. 2671 (2024). IGRA's implementing regulations also expressly state that tribes can regulate online gaming under the terms of their IGRA compacts. *See* 25 C.F.R. § 293.26.

Crypto.com has also argued below that the Unlawful Internet Gaming Enforcement Act ("UIGEA"), not tribal-state IGRA agreements or state gaming law, solely governs the online gaming aspect of its sports-betting contracts, and UIGEA excludes DCM transactions from its definition of "bet or wager." Pl.'s Response to Br. of Amici Curiae et al. at 2–3, *Crypto.com v. Dreitzer*, No. 2:25-cv-00978 (D. Nev. Sep. 29, 2025), Dkt. No. 92. Crypto.com claims that Congress's exclusion of DCM transactions from the definition of "bet or wager" in 31 U.S.C. § 5362 "reflects Congressional intent" that UIGEA preempts IGRA and all tribal-state IGRA agreements. *Id.* But this ignores UIGEA's own language that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). UIGEA[8] "prevents using the internet to circumvent existing state and federal gambling laws, but it does not create any additional substantive prohibitions." *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 965 (9th Cir. 2018).

---

[8] The CFTC raises a similar UIGEA argument. *See* CFTC Amicus Br. at 24 n.15. Unlike Crypto.com, however, the CFTC makes no attempt to explain how the 2010 CEA amendments silently overrode other federal gaming law with longstanding restrictions on sports betting, including IGRA. This is for good reason: Congress did not express sufficient intent to repeal key components of other federal and state statutes regulating sports betting. *See* ER-26–30.

## II.    The Major Questions Doctrine Forecloses Crypto.com's Theory.

In 2010, federal law—namely, the Professional and Amateur Sports Protection Act ("PASPA")—largely prohibited sports betting nationwide. Crypto.com's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but also to reverse the federal policy that at the time prohibited sports betting—turning it instead into a nationwide authorization of such betting under the CFTC's jurisdiction.[9] Whether Congress did so is a major question.

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in cases where the agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization." *Id.* at 723 (citation modified).  Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a

---

[9] Crypto.com's sports-betting contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 U.S.C. § 1955, and the Travel Act, 18 U.S.C. § 1952(a).  If Congress authorized sports betting via the CEA in 2010, then it also effectively limited the scope of these federal laws.

22

'radical or fundamental change' to a statutory scheme." *Id.* (quoting *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994)); *see also Learning Res. v. Trump*, No. 24-1287, 2026 WL 477534, at *2 (U.S. Feb. 20, 2026).

In effect, Crypto.com contends that the 2010 CEA amendments displaced state and tribal gaming regulations, undermined all tribal-state gaming compacts, legalized sports betting nationwide, and placed sports betting under the regulatory jurisdiction of the CFTC, all at a time when federal law broadly prohibited sports betting. This is unquestionably a "radical" and "fundamental" overhaul to both PASPA and IGRA, and certainly raises concerns of "economic and political significance." *West Virginia*, 597 U.S. at 721. This Court therefore has significant "reason to hesitate" and should require "clear congressional authorization" before even considering Crypto.com's preemption argument. *Id.* at 721, 724.

First, Congress must be clear when it "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). Here, gaming regulation, and even sports-betting regulation specifically, has been understood to be within traditional state power. *See Murphy v. NCAA*, 584 U.S. 453, 474, 481–85 (2018); *see also Artichoke Joe's*, 353 F.3d at 737 ("The circuits that have given significant attention to equal protection challenges to state gambling laws have, by

23

and large, held 'the regulation of gambling lies at the heart of the state's police power.'" (quoting *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003))).  As the Supreme Court noted in *Murphy*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling."  584 U.S. at 484; *see also Chicken Ranch*, 42 F.4th at 1032 (explaining that IGRA "strike[s] a delicate balance" between tribal and state sovereignty over gaming).  And even when Congress chose to prohibit sports betting nationally, it did so *through* state regulation, rather than by directly regulating private actors.  *See Murphy*, 584 U.S. at 484–85.

Similarly, courts have long recognized tribes' inherent sovereign authority to regulate gaming on their lands.  *See Cabazon*, 480 U.S. at 207–14.  Though it imposes limited restrictions on this authority, IGRA still broadly advances tribes' "exclusive right to regulate [and offer] gaming activity" (including sports betting) on their Indian lands as a means of promoting tribal economic development and self-determination.  *See* 25 U.S.C. §§ 2701(5), 2702(2); *W. Flagler*, 71 F.4th at 1062–63.  And later-enacted statutes of general applicability—like the CEA— cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with tribes—like IGRA—without a clear statement from Congress.  *See, e.g.*, *Mancari*, 417 U.S. at 550–51.

24

Accordingly, because regulating gaming has long been a traditional state (and tribal) power, Crypto.com must show clear congressional language overturning federal policy. But it cannot because no such language exists. Rather, the CEA *reinforces* the federal policy in favor of state gambling regulation by disclaiming preemption of state gaming laws. *See* 7 U.S.C. § 16(e). And nothing in the definition of "swap" indicates that Congress meant to overturn the entire field of sports-betting regulation or Indian gaming.

Second, sports betting has a "unique place in American history and society," and therefore its own "political history." *See FDA v. Brown & Williamson*, 529 U.S. 120, 159–60 (2000). Given this social and political history, at the time of the 2010 CEA amendments, Congress had already "created a distinct regulatory scheme" for sports betting—namely, PASPA. *Id.* The conflict between Crypto.com's argument and the existence of PASPA's nationwide sports-betting prohibition in 2010 therefore indicates that Congress could not have intended to regulate sports betting in the way that Crypto.com now claims. "Given this history and the breadth of the authority that [Crypto.com] has asserted [the CFTC has]," this Court should not defer to Crypto.com's "expansive construction" of the CEA. *Id.* at 160.

In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had already preempted all state gaming laws eight years earlier.

25

*Murphy*, 584 U.S. at 479–80.  To the contrary, the majority opinion concluded with an observation utterly incompatible with Crypto.com's contention: "The legalization of sports gambling requires an important policy choice, but the choice is not ours to make.  Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own."  *Id.* at 486.  In other words, Crypto.com's deregulatory elephant was hidden in a statutory mousehole far too small for the Supreme Court to notice when deciding whether sports betting would be legal.  Crypto.com's position that Congress legalized sports betting in 2010 would have certainly come as a surprise to the Supreme Court and litigants in *Murphy*—none of whom seemed to think that the state prohibition at issue had actually been preempted years earlier.

Ignoring history, context, and common sense, Crypto.com presents an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), governs nationwide sports betting.  Crypto.com therefore creates a world where Congress repealed the comprehensive regulatory scheme set forth in IGRA, similar structures created by state law, and the then-federal policy requiring states to prohibit sports betting, as codified in PASPA.  And Crypto.com incredibly argues all of this happened without even a whisper of legislative intent.

26

Crypto.com's revisionist history cannot withstand even the slightest scrutiny.  As the district court aptly stated, "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010."  Order Granting Motion to Dissolve Preliminary Injunction at 20, *Hendrick*, No. 2:25-cv-00575, Dkt. No. 237.

## III.    Crypto.com's Preemption Argument Would Violate the Private Nondelegation Doctrine.

Crypto.com's preemption argument turns on the extraordinary claim that Congress delegated the power to preempt state law to an interested private party simply by self-certifying sports-betting contracts and listing them on its exchange. The private non-delegation doctrine, however, guards against precisely the type of unchecked, privately exercised powers upon which Crypto.com relies.  *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

While the Supreme Court upholds congressional delegations of power to federal agencies with an intelligible principle, it applies a different standard when those delegations are to private entities.  "[A] law … violates the private nondelegation doctrine when it allows non-government entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025).  Recently the Supreme Court found

27

that the permissibility of a private delegation depends on whether the agency retains oversight and ultimate decision-making authority over the private entity's actions. *Id.* at 693. There, the Court upheld the delegation to a private entity, but only because it merely played "an advisory role" and the final decision-making authority rested with the agency. *Id.*

In contrast, under Crypto.com's theory, the CEA's self-certification provisions empower Crypto.com—a private, for-profit entity—to oversee its entire sports-betting enterprise, yet simultaneously fail to provide any mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC may implement its discretion. *See* Kristin N. Johnson, *Farewell Address of Commissioner*, CFTC (Sep. 3, 2025), https://www.cftc.gov/PressRoom/Speeches Testimony/opajohnson25 (warning that the CFTC has "too few guardrails and too little visibility into the prediction market landscape").

Further, according to Crypto.com, its self-certifications are not merely advisory but have the force of law. *See* Pl.'s Opening Br. at 63, Dkt. No. 12.1. "The result of this regulatory scheme is that [Crypto.com] can, without any [CFTC] review of its decision on the merits, effectively decide" to offer sports betting free from tribal and state regulation. *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1328 (D.C. Cir. 2024). Consequently, construing the CEA to attribute legal effect on state law via Crypto.com's self-certification would

28

be unconstitutional—a construction that must be avoided.  *See United States v. Metcalf*, 156 F.4th 871, 881–82 (9th Cir. 2025).

Moreover, Crypto.com has a financial interest in self-certifying its own sports-betting contracts, regardless of such certifications' verity.  And this financial interest is directly adverse to the sovereign and economic interests of the State of Nevada, Amici Tribes, other states, and businesses offering sports betting across the country.  The effects of these self-certifications go even further; in Crypto.com's view, it can block tribes and states from regulating that which has long been within their sovereign authority to regulate simply by listing sports-betting contracts on its exchange.  "This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business."  *Carter Coal*, 298 U.S. at 311.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court affirm the lower court's decision.

Dated: March 10, 2026

/s/ Joseph H. Webster
Joseph H. Webster
Elizabeth A. Bower
Jens W. Camp
Alexandra K. Holden
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com
aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Bryan Newland
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
(202) 349-4265
Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian
Community, Mohegan Tribe of
Indians of Connecticut, Rincon Band
of Luiseño Indians, and Santa Ynez
Band of Chumash Mission Indians*

Respectfully submitted,

Scott Crowell
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño
Indians, Santa Ynez Band of Chumash
Mission Indians, and Spokane Tribe
of the Spokane Reservation*

Michael Hoenig
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
(909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San
Manuel Nation and San Manuel
Gaming and Hospitality Authority*

30

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2026, a copy of the foregoing was filed with the Clerk of Court via this Court's electronic filing Appellate Case Management System, which will provide notice and service on all counsel of record for all parties.

Dated: March 10, 2026                          /s/ Joseph H. Webster
                                               Joseph H. Webster

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-7187

I am the attorney or self-represented party.

**This brief contains** 6,494 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Joseph H. Webster    **Date** 3/10/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

**9th Cir. Case Number(s)** *Instructions:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf | 25-7187 |

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

| (see attached list of Tribal Amici) |

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes  ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   |  |

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes  ◉ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                    *1*                    *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

N/A

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

N/A

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?
   ○ Yes     ● No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

● this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** /s/Joseph H. Webster     **Date** 3/10/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                                          2                                          *New 12/01/24*

Tribal Amici include:

Indian Gaming Association; National Congress of American Indians; United South and Eastern Tribes Sovereignty Protection Fund; Arizona Indian Gaming Association; California Nations Indian Gaming Association; Oklahoma Indian Gaming Association; Washington Indian Gaming Association; San Manuel Gaming and Hospitality Authority; Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Jamestown S'Klallam Tribe; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuhaaviatam of San Manuel Nation.